## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS WESTERN DIVISION

| | |
|---|---|
| CANNA PROVISIONS, INC., GYASI SELLERS, WISEACRE FARM, INC., VERANO HOLDINGS CORP., <br><br> PLAINTIFFS, <br><br> -AGAINST- <br><br> MERRICK GARLAND, IN HIS CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, <br><br> DEFENDANT. | No. 23-cv-30113 |

## COMPLAINT

Plaintiffs Canna Provisions, Inc., Gyasi Sellers, Wiseacre Farm, Inc., and Verano Holdings Corp. ("Plaintiffs"), by and through their undersigned attorneys, allege as follows, upon personal knowledge as to their own acts and status, and upon information and belief as to all other matters, for their Complaint against Defendant Merrick Garland, in his capacity as Attorney General of the United States:

### NATURE OF THE ACTION

1.      Plaintiffs operate businesses in the Commonwealth of Massachusetts providing adults with strictly regulated access to marijuana.  Plaintiffs' businesses grow, process, transport, and sell marijuana within the Commonwealth.  Plaintiffs adhere to comprehensive Massachusetts regulations that are intended to, and do, prevent legal marijuana from entering interstate commerce and distinguish their legal marijuana from illicit products.  Plaintiffs' local activities, however, are deemed illegal under the federal Controlled Substances Act, which makes it illegal

to "manufacture, distribute, or dispense" marijuana, even in intrastate commerce.  21 U.S.C. § 841(a)(1).

2.     Marijuana is a flowering plant—also known as cannabis.  Intrastate marijuana refers to marijuana that is grown, harvested, processed, transported, and sold to consumers all within a single state.  In 2005, the United States Supreme Court held that because Congress intended to "eradicate" marijuana from interstate commerce, including both economic and non-economic uses of marijuana, the federal government had a rational and therefore lawful purpose in intruding on the states' internal regulation of marijuana.  In the decades since that decision, Congress and the Executive Branch have abandoned any intent to "eradicate" marijuana.  Numerous states have also implemented programs for regulated marijuana that is not fungible with, and is distinguishable from, illicit interstate marijuana.  Despite these changes, the federal criminal prohibition on intrastate marijuana remains in place, an unjustified vestige of a long-abandoned policy.  This unjustified intrusion of federal power harms Plaintiffs, threatens the communities they serve, and lacks any rational purpose.

3.     Plaintiff Gyasi Sellers, a native of Springfield, Massachusetts, is an entrepreneur and the operator of a courier service that transports marijuana intrastate within the Commonwealth.  Mr. Sellers seeks, through his businesses, to serve communities that have suffered under the war on drugs[1] and to provide job training and skills for ex-offenders.  He and his businesses, however, face hurdles at every step caused by the illegal status of state-regulated marijuana under federal law.  These include not being able to obtain loans from the Small

---

[1] "The 'War on Drugs' refers to punitive criminal sanctions for drug offenses and use of a harsh criminal justice approach in managing societal problems with drugs in the United States." *Identifying Disproportionately Impacted Areas by Drug Prohibition in Massachusetts*, Cannabis Control Comm'n at 4 (Mar. 2021), https://masscannabiscontrol.com/wp-content/uploads/20210310_DI_Study_Report.pdf.

Business Administration, which deems his and all other marijuana businesses "ineligible for SBA financial assistance," regardless of whether they comply with state law.

4.     Plaintiff Canna Provisions, Inc. operates award-winning marijuana retail shops in western Massachusetts.  Canna Provisions also provides free training activities for individuals interested in joining the regulated marijuana industry.  However, because Canna Provisions' business (while legal under Massachusetts law) is deemed illegal under the Controlled Substances Act, Canna Provisions has been barred by one of the primary career services organizations in Massachusetts, MassHire, from posting jobs or running workshops.  Canna Provisions' employees and officers have also had personal bank accounts shut down or mortgages declined because they work in a lawful intrastate marijuana business.

5.     Plaintiff Wiseacre Farm, Inc. is an outdoor farm in Berkshire County, Massachusetts.  Wiseacre Farm cultivates marijuana plants for sale in, and only in, Massachusetts.  Wiseacre Farm previously attempted to lease additional underused acreage from a willing farmer in western Massachusetts.  However, Wiseacre Farm was shut out from leasing land from farmers, because Wiseacre Farm's activities (while legal under Massachusetts law) are deemed illegal under the Controlled Substances Act.  That illegal status renders farmers unwilling to lease their underused farmland to Wiseacre Farm out of fear that having marijuana cultivated on their land will cause them to lose federal agriculture grant money.

6.     All of these harms, along with numerous other harms to Plaintiffs alleged herein, are caused by the federal government's unconstitutional ban on cultivating, manufacturing, distributing, or possessing intrastate marijuana.  21 U.S.C. § 841(a).

A. **The Federal Ban on Intrastate Marijuana Undermines State Marijuana Programs, Harms Businesses Large and Small, and Threatens Public Safety.**

7.    Marijuana has been cultivated and used in United States since the colonial era. By the 19th Century, Americans were consuming marijuana for medical and recreational purposes.  Intrastate marijuana remained the province of state regulation until 1970, when the federal government banned marijuana under the Controlled Substances Act.  In the 1990s and early 2000s, states began to legalize and regulate marijuana within their borders.  These initiatives have led to strictly-regulated intrastate marijuana programs, pursuant to which marijuana is grown, harvested, packaged, and sold within a single state, without entering into interstate commerce.  In 2012, Massachusetts adopted its own intrastate medical marijuana regime.  Four years later, Massachusetts voters approved a measure to legalize and regulate the cultivation and distribution of marijuana for adult use.

8.    Today thirty-eight states have legalized and regulate medical, or both medical and adult-use, marijuana.  These state-run programs serve multiple goals, including eliminating the criminalization and incarceration of individuals for possessing marijuana, protecting consumers by providing them access to regulated products, and aiding communities "that have previously been disproportionately harmed by cannabis prohibition and enforcement."  Mass. Gen. Laws ch. 94G, § 4(a1/2)(iv).

9.    Under the Massachusetts program, marijuana is cultivated in Massachusetts, processed in Massachusetts, transported to dispensaries within Massachusetts, and distributed to consumers in Massachusetts.  This intrastate marijuana is tested in Massachusetts and systematically traced from seed to sale, per a comprehensive state regulatory regime that both protects consumers and ensures that the regulated marijuana sold in Massachusetts is

distinguishable from illegal, interstate marijuana.  Operators of licensed marijuana businesses, including Plaintiffs, have invested heavily to make this market succeed.

10.     Federal law, however, criminalizes participation in Massachusetts' regulated market for marijuana.  The federal Controlled Substances Act ("CSA") makes it a crime "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense" marijuana.  21 U.S.C. § 841(a)(1); *see* 21 U.S.C. § 812(c).  While the Constitution empowers Congress to ban marijuana from *interstate* commerce (commerce that crosses state lines), the CSA exceeds that constitutional limit.  Its ban on marijuana extends to the *intrastate* markets created by Massachusetts and dozens of other states.  Plaintiffs' efforts at locally growing, locally processing, and locally distributing marijuana in Massachusetts are therefore deemed illegal under the CSA.  This classification creates a risk of prosecution under federal law for Plaintiffs as well as several other ongoing and irreparable harms.

11.     **The CSA Cuts State-Regulated Marijuana Businesses Off from Government Programs, Basic Services, and Financial Services, Including Payroll Processing and Credit Card Processing**.  By criminalizing marijuana production and distribution, the CSA restricts state-regulated marijuana businesses from participating in federal programs and limits their access to fundamental aspects of the economy.  For example, federal grants and loans are often conditioned on the grantee not violating federal criminal law: as a result, state-regulated marijuana businesses cannot obtain these benefits, and entities that have federal grants or loans are often unwilling to work with state-regulated marijuana businesses, for fear of being disqualified from those benefits.  MassHire, a career services organization with federal funding in Massachusetts, refuses to post jobs for Plaintiff Canna Provisions.  Plaintiffs have also faced difficulties obtaining basic services, such as advertising and payroll processing.

12.     State-regulated marijuana businesses are also cut off from important aspects of the financial system, including credit card processors.  Credit card processors refuse to work with state-regulated cannabis businesses out of fear that doing so would subject the card processors to federal prosecution or regulatory scrutiny under the Bank Secrecy Act and similar laws.  While regulated marijuana businesses are legal under state law, they are deemed illegal under federal law, and financial institutions that serve those businesses can themselves face prosecution or regulatory action.  An institution that provides a checking account to, underwrites a loan for, provides an insurance policy to, or processes a credit card transaction with a cannabis business can be liable for conspiracy to violate the CSA, aiding and abetting a violation of the CSA, or laundering money from a violation of the CSA.  Those financial institutions can also be held criminally or civilly liable, or otherwise come under regulatory scrutiny, for having inadequate anti-money laundering controls under the Bank Secrecy Act.

13.     To avoid those risks, financial institutions avoid working with state-regulated marijuana companies.  Being cut off from these institutions harms Plaintiffs' businesses. Without the ability to accept credit cards for payment, Plaintiffs' businesses rely on cash transactions.  With fewer insurers willing to work with state-regulated marijuana businesses, insurance premiums are higher.  Because so many lenders are unwilling to work with state-regulated marijuana businesses, transactions as basic as leasing a car or obtaining a mortgage have become costly and difficult.

14.     **The CSA Creates Public Safety Risks.**  Without access to credit cards or online payment, state-regulated marijuana businesses must rely heavily on cash, creating serious public safety risks.  State-regulated marijuana dispensaries have become targets of robberies.  The lack of online payments also creates safety risks for state-regulated marijuana couriers, who deliver

marijuana directly from dispensaries to consumers.  For almost every other modern delivery service, the consumer can pay in advance via a secure online payment through a phone or website.  Not so with state-regulated marijuana delivery.  Because marijuana businesses are cut off from accepting credit card payments, regulated courier services must wait until they are at the customer's location to learn whether the customer has the money to pay for the purchase, or even intends to go through with the purchase at all.

15.     **The CSA Blocks State-Regulated Marijuana Businesses from Serving Low-Income Communities.**  The CSA's ban on intrastate marijuana has led to a ban on marijuana in federal public housing.  As a result, marijuana courier services cannot make deliveries to public housing in Massachusetts.

16.     **The CSA Results in Punitive Taxation and Eliminates State-Regulated Marijuana Businesses' Rights Under Federal Law.**  The CSA also creates onerous tax consequences for state-regulated marijuana businesses.  Because state-regulated marijuana businesses are deemed traffickers in Schedule I substances under the CSA, they are prohibited from claiming deductions or credits on their federal taxes.  *See* I.R.C. § 280E.  State-regulated marijuana businesses must therefore pay taxes on revenues that they have already spent on salaries, rent, interest payments, and other ordinary and necessary expenses that normally would be deductible.  The result of this is devastating to the bottom line of these businesses, particularly small businesses with lower margins.  The CSA also results in state-regulated marijuana businesses not being able to register their trademarks with the United States Patent and Trademark Office.  And if those businesses cannot pay their debts, they are cut off from federal bankruptcy protection, again because their activities are deemed illegal under the CSA.

17.     These collateral harms increase the costs of state-regulated marijuana businesses and reduce participation in state-regulated marijuana markets.  As a result, there is less innovation and less consumer choice.

**B.     Congress Has No Rational Basis for Prohibiting State-Regulated Intrastate Marijuana.**

18.     Each of these harms are the direct result of the CSA's unconstitutional imposition on state sovereignty.  While Congress has authority to ban marijuana from *interstate* commerce, it has no general police power over marijuana grown, transported, and distributed in *intrastate* commerce.  Neither the Commerce Clause nor the Necessary and Proper Clause of the Constitution permit this overreach by Congress.

19.     In 2005, the Supreme Court in *Gonzales v. Raich* rejected a challenge to the CSA's regulation of non-commercial, intrastate medical marijuana production and use.  The Court reached that decision by relying on three facts, none of which are still true today.  First, the Court relied on "findings by Congress" that intrastate "distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances."[2]  Second, the Court found (and no party disputed at the time) that marijuana was a fungible commodity, akin to wheat.[3]  Third, the Court concluded that permitting intrastate marijuana would undermine Congress's goal of creating a "closed regulatory system" that would "eliminat[e] commercial transactions in the interstate market in their entirety."[4]

20.     None of these findings are true today.

---

[2] *Gonzales v. Raich*, 545 U.S. 1, 12, 20 & n.20 (2005) (quoting 21 U.S.C. § 801(4)).

[3] *Id.* at 18-20.

[4] *Id.* at 13, 19-22, 28.

21.      **Massachusetts' and Other States' Regulated Marijuana Markets Have**

**Reduced Interstate Commerce in Marijuana.** *Gonzales*'s constitutional analysis depended

upon the assumption that permitting intrastate marijuana would lead to a substantial increase or

"swelling" of traffic in interstate marijuana.[5]   However, the intervening eighteen years have

proven the opposite: that regulated intrastate marijuana has led to a substantial *reduction* in

interstate marijuana.  The regulated market in Massachusetts, and the dozens of intrastate

markets like it, have substantially reduced *interstate* commerce in marijuana by providing a

regulated alternative for consumers.  From 2012 to 2022, the amount of illicit marijuana seized

by U.S. Customs and Border Protection declined by almost 95%, *i.e.*, marijuana consumers are

getting their marijuana less and less from the interstate channels that Congress sought to prohibit,

and more from regulated intrastate retailers.[6]  This steep decline in marijuana imports deprives

criminal organizations of a major source of illicit revenue.

22.      **Massachusetts' State-Regulated Marijuana Is Not Fungible with, and Is**

**Distinguishable from, Illegal Interstate Marijuana.**  Another fact critical to the *Gonzales*

Court's analysis was that marijuana was "a fungible commodity."[7]  This fungibility in turn meant

that "it is not feasible to distinguish, in terms of controls, between controlled substances

manufactured and distributed interstate and controlled substances manufactured and distributed

intrastate."[8]  This point was not disputed at the time: *Gonzales* observed that "the parties and the

numerous *amici*" in that case "all seem to agree" that the marijuana market was "fully

---

[5] *Id.* at 12 n.20; *see id.* at 30-32.

[6] Josh Lee, *Border Patrol Pot Seizures Down*, The Paper (Feb. 10, 2023),
https://abq.news/2023/02/border-patrol-pot-seizures-down/.

[7] *Gonzales*, 545 U.S. at 18, 22.

[8] *Id.* at 12 n.20 (quoting 21 U.S.C. § 801(5)); *see id.* at 20 (relying on "findings by Congress").

comparable" to the market for wheat.[9]  But even if that were true then, it is demonstrably false

now.  Today's regulated marijuana is not fungible like wheat.  Among other things, state-

regulated marijuana products are distinguishable (from each other and from illicit interstate

marijuana) based on the labelling and tracking requirements that states impose.  Regulated

marijuana in Massachusetts is subject to a strict tracking and labelling system that applies at

every stage of the supply chain from seed to sale.  As a result, far from being a fungible mass

commodity, each marijuana product sold under Massachusetts' regulations is traceable to its

origin and distinct from illicit interstate marijuana.  Thus, contrary to *Gonzales*'s findings about

the state of the world in 2005, today it is readily "feasible to distinguish" between regulated

intrastate marijuana and illegal interstate marijuana—indeed, it is required.[10]

23.     **The Federal Government Has Abandoned Any Goal of Eliminating**

**Marijuana from Interstate Commerce.**  The final critical fact for *Gonzales*'s constitutional

holding was that Congress had enacted "comprehensive legislation" aimed at "eliminating"

interstate marijuana.[11]  That was true in 2005.  When Congress first passed the CSA, it intended

to create a closed regulatory system that eliminated marijuana from interstate commerce, except

for certain federally sanctioned research projects.  In the intervening years, the federal approach

to marijuana has shifted drastically.  Subsequent legislation by Congress has abandoned the goal

of a comprehensive ban.  The federal government no longer operates under any assumption that

banning intrastate marijuana is necessary to policing interstate marijuana.  What was once a

single-minded federal crusade against the cannabis plant has been replaced with an ambivalent

---

[9] *Id.* at 20-21.

[10] *Id.* at 12 n.20.

[11] *Id.* at 19, 22.

set of inconsistent policies, some aimed at reducing federal interference with state efforts to regulate marijuana.  Among other things:

24.     *Congress Permits Medical Marijuana in Washington D.C.*  In 2010, Congress permitted the District of Columbia to enact a medical marijuana program.

25.     *Congress Permits Medical Marijuana Cultivation, Distribution, and Use Pursuant to State Medical Marijuana Programs.*  Beginning in 2014, Congress has used appropriations acts to bar the Department of Justice from enforcing the CSA against any persons participating in state-regulated medical marijuana programs.  These programs now operate in thirty-eight states.[12]

26.     *The Department of Justice Avoids Prosecuting State-Regulated Marijuana Businesses Acting in Compliance with State Law.*  The Department of Justice's approach to intrastate marijuana has also changed substantially over the last decades.  When California first legalized medical marijuana, the Department of Justice aggressively enforced the CSA against participants in California's program, including raiding the home of a seriously ill patient and destroying her six marijuana plants.[13]  The Department of Justice later abandoned this policy, however, and has since avoided prosecuting persons for participating in state-regulated marijuana programs.  In August 2013, then-Deputy Attorney General James Cole issued a memorandum stating, among other things, that it was not a priority for the Department of Justice to prosecute persons for acting in compliance with state-regulated marijuana regimes.  While that memorandum was subsequently rescinded by then-Attorney General Jeff Sessions, his successor William Barr reaffirmed the central guidance of the Cole memorandum by stating: "I'm not

---

[12] *State Medical Cannabis Laws*, Nat'l Conf. of State Legislatures (last updated June 22, 2023), https://www.ncsl.org/health/state-medical-cannabis-laws.

[13] *See Gonzales*, 545 U.S. at 7.

going to go after companies that rely on the Cole Memorandum."[14]  This policy has continued under the current administration.

27.     In short, the federal government has long ago abandoned the goal of eliminating marijuana from commerce.  Nor does Congress have any comprehensive—or even consistent and rational—approach to marijuana regulation.  This inconsistent, patchwork approach to marijuana regulation provides no basis for Congress to regulate intrastate marijuana.

28.     Without court intervention, the CSA will continue to undermine state efforts to create safe and regulated intrastate markets for marijuana.  As long as the CSA continues to prohibit intrastate cultivation, manufacture, possession, and distribution of marijuana, Plaintiffs and the communities they serve will suffer irreparable harm.

## FACTUAL ALLEGATIONS

### I.     Jurisdiction and Venue.

29.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case presents a federal question under both the CSA and the U.S. Constitution.  The Court additionally possesses jurisdiction to make a declaratory judgment under 28 U.S.C. § 2201(a).

30.     Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(e)(1), because the action is against an officer of the United States in his official capacity, the case does not involve real property, and Plaintiffs Canna Provisions, Inc.; Gyasi Sellers; and Wiseacre Farm, Inc. reside in the Western Division of this district.

---

[14] Jacqueline Thomsen, *Barr: I Wouldn't Go after Businesses Relying on Obama-Era Marijuana Policy*, The Hill (Jan. 15, 2019), https://thehill.com/homenews/senate/425466-barr-i-wouldnt-go-after-businesses-relying-on-obama-era-marijuana-policy/.

## II.   Parties.

31.   Defendant Merrick Garland is the Attorney General of the United States and is named as a defendant in his official capacity.  His principal place of business is Washington D.C.

32.   Plaintiff Canna Provisions, Inc. ("Canna Provisions") is a Massachusetts corporation with its principal place of business in Berkshire County.  Canna Provisions' co-owner and CEO is Meg Sanders, who was recently lauded in *Forbes* as a "leader" and "icon of the cannabis industry,"[15] and in 2022 received the Cannabis Businessperson of the Year award. Before moving to Massachusetts, Ms. Sanders was one of the pioneers in Colorado's adult-use marijuana industry, providing input on the regulations and opening one of Colorado's first adult-use dispensaries.  Under Ms. Sanders' management, Canna Provisions operates two retail adult-use dispensaries—located in Lee and Holyoke—as well as a craft cultivation facility, each of which is licensed by the Cannabis Control Commission.  Canna Provisions' innovative retail shops have been lauded as "setting the bar" in their field, and its Holyoke shop has been named Best Recreational Dispensary in Massachusetts three years in a row.  Canna Provisions' operations are intrastate within Massachusetts.

33.   Canna Provisions is committed to serving communities that have been disproportionately impacted by the war on drugs.  Canna Provisions is focused on maintaining a workforce made up of at least 35% persons with past drug convictions (or who have parents or spouses with drug convictions), persons from Holyoke and Pittsfield, or persons designated by the Commonwealth as Social Equity Program participants.  Canna Provisions also gives to

---

[15] *Cannabis Provisions' CEO Is Reinventing Cannabis Dispensaries as Destination Stores in Massachusetts*, Forbes (Jan. 21, 2023), https://www.forbes.com/sites/qai/2023/01/21/canna-provisions-ceo-is-reinventing-cannabis-dispensaries-as-destination-stores-in-massachusetts/?sh=537d08301135.

myriad local charities, provides job-training seminars at Holyoke and Berkshire community colleges, and provides workshops for community members, including at retirement homes. Canna Provisions also supports its employees' volunteer efforts, providing them with an additional 40 hours of paid time off every year for volunteering.  For its efforts, Canna Provisions was recognized as Corporate Citizen of the Year in Lee, Massachusetts for 2023.

34.     Canna Provisions would do even more to serve the community but has been turned away by charitable and Commonwealth organizations because its activities are still considered illegal under federal law.  Canna Provisions has sought to sponsor training programs through MassHire—a career services organization operated by the Commonwealth—to teach people how to get started in the cannabis industry.  One of Canna Provisions' goals is to show recent graduates and other job seekers that they do not need to have specialized education to enter, or succeed in, the cannabis industry.  MassHire career centers, however, refuse to provide services for companies or job seekers in the Massachusetts cannabis industry, due to the illegal status of that industry under federal law.  As a result, Canna Provisions is restricted in the outreach it can provide.

35.     The federal ban on intrastate marijuana also hinders Canna Provisions' efforts to maintain its employees and officers.  Multiple Canna Provisions employees have had difficulties obtaining mortgages due to the fact that they earn their income in the cannabis industry.  One of Canna Provisions' officers had his personal bank accounts shut down by his bank because of his involvement in the state-regulated cannabis industry.

36.     Canna Provisions also faces serious difficulties in finding counterparties and service providers, due to federal law prohibiting Canna Provisions' intrastate marijuana business. Promotional companies and magazines have refused to work with Canna Provisions for this

reason.  As have payroll services and 401(k) providers.  Canna Provisions has also lost the ability to accept credit cards, due to credit card processors refusing to service the state-regulated marijuana industry.  After being cut off by credit card processors, the average amount customers spent at Canna Provisions' stores dropped by around 30%.  Because many banks, insurance companies, and other providers refuse to work with state-regulated marijuana businesses, Canna Provisions has higher interest rates, insurance premiums, and payments for goods and services than it would if intrastate marijuana were not illegal under federal law.

37.     Plaintiff Gyasi Sellers is an entrepreneur and resident of Ludlow, Massachusetts. Mr. Sellers grew up in Springfield, a city that has been identified by the Commonwealth as an area disproportionately impacted by the war on drugs.  He later worked as a corrections officer, putting him face to face again with persons caught up in the nation's failed effort to eradicate drugs.  When Massachusetts began legalizing adult-use marijuana, Mr. Sellers decided to enter the state-regulated marijuana market, with the goals of being a positive force in the community, changing the perceptions associated with marijuana use, and helping recently incarcerated persons integrate into society and avoid recidivism.

38.     In 2019, Mr. Sellers became one of the first participants in the Cannabis Control Commission's Social Equity Program.  The Social Equity Program is aimed at creating "sustainable pathways into the cannabis industry for individuals most impacted by the War on Drugs."  Mr. Sellers operates a licensed marijuana courier service in Massachusetts.  By operating a courier service that connects licensed marijuana retailers with customers, Mr. Sellers has created opportunities for individuals with mobility issues or other limitations and who might otherwise not be able to participate in the Commonwealth's regulated marijuana programs.

39.     Mr. Sellers has also co-founded, and is in the process of obtaining licensing for, a marijuana delivery service based in Springfield, Tree N' Brick.  Mr. Sellers plans for Tree N' Brick to function as both a marijuana retailer and delivery service: purchasing marijuana from licensed marijuana businesses in the state and then delivering those marijuana products to consumers.  In 2022, the Springfield City Council unanimously approved Tree N' Brick's request for a special permit.

40.     Mr. Sellers' participation in the Commonwealth's marijuana programs is intrastate.  While the business activities he pursues are legal under Massachusetts law, they are illegal under the CSA.  As a result, Mr. Sellers has faced numerous setbacks and hurdles. Because credit card processors have policies barring state-regulated marijuana transactions, customers using his courier service cannot pre-pay for the marijuana they purchase.  Instead, couriers must wait until they arrive at the customer's location and meet the customer to accept payment.  This situation creates both economic risks for Mr. Sellers' operations and security risks for the drivers.  Mr. Sellers has also faced difficulties with tasks as basic as obtaining leases for vehicles, because intrastate marijuana courier services are deemed illegal under federal law.

41.     The federal ban on intrastate marijuana also prevents Mr. Sellers from obtaining financial assistance from the Small Business Administration.  Because the CSA criminalizes intrastate marijuana, the Small Business Administration has adopted a policy that state-regulated marijuana business are "ineligible for SBA financial assistance," "even if the business is legal under local or state law where the applicant business is or will be located."[16]  The federal ban on

---

[16] *Revised Guidance on Credit Elsewhere and Other Provisions in SOP 50 10 5(J)*, Small Business Administration, Policy Notice 5000-17057 (Apr. 3, 2018), https://www.sba.gov/document/policy-notice-5000-17057-revised-guidance-credit-elsewhere-other-provisions-sop-50-10-5j.

intrastate marijuana also prevents courier businesses from delivering marijuana to residents in federal housing, thus undermining one of Mr. Sellers' goals of providing services for underserved and disproportionately impacted communities.

42.    Plaintiff Wiseacre Farm, Inc. ("Wiseacre Farm") is a Massachusetts corporation, with its principal place of business in Berkshire County.  Wiseacre Farm is licensed by the Cannabis Control Commission as a marijuana cultivator.  Wiseacre Farm operates an outdoor farm focused on growing marijuana sustainably in the Massachusetts climate.

43.    Wiseacre Farm's operations are intrastate within Massachusetts.  While Wiseacre Farm's activities are legal under Massachusetts law, they are considered illegal under federal law.  Wiseacre Farm is cut off from many providers of services to small businesses, including major payroll processors, because those providers are unwilling to work with businesses that are illegal under federal law.  Cut off from access to direct deposit services, Wiseacre Farm must pay its employees by check.  Multiple insurers have likewise refused to insure the property where Wiseacre Farm operates, because Wiseacre Farm's activities are illegal under federal law.  For that same reason, only certain banks are willing to work with Wiseacre Farm, and those banks require Wiseacre Farm to pay additional fees because of regulatory issues associated with banking marijuana companies.

44.    The federal ban on intrastate marijuana has also hindered Wiseacre Farm's efforts to create more jobs in underserved communities and to support local farmers.  Wiseacre Farm had attempted to lease underused land from another farm in Berkshire County; however, that farm ultimately declined, out of concern that having federally-illegal intrastate marijuana cultivation on its land could disqualify the entire farm from receiving federal assistance.  But for the federal ban on intrastate marijuana, Wiseacre Farm could have proceeded with the lease.

45.     Plaintiff Verano Holdings Corp. ("Verano") is a Canadian corporation with its principal place of business in Chicago, Illinois.  Verano operates regulated cannabis businesses through wholly-owned subsidiaries in Massachusetts and other states.  Verano's goal is to further communal wellness by providing responsible access to regulated medical and adult-use cannabis products to consumers.  Verano's Massachusetts operations are licensed by the Cannabis Control Commission, including cultivation, manufacturing, medical, and adult-use licenses.  Verano's cultivation, processing, possession, and distribution of marijuana in Massachusetts is intrastate. While Verano's operations are legal under Massachusetts law, they are illegal under the CSA. Because of that illegal status, Verano faces ongoing harms, including that Verano's Massachusetts retail operations are unable to accept credit cards.  That illegal status also results in Verano having to pay higher insurance premiums and limits Verano in terms of service providers willing to work with the company.[17]

### III.    Cannabis Has Historically Been Regulated at the State Level, Including Regulations on the Consumption of Cannabis.

46.     When the Constitution was ratified in 1788, the new states brought with them over one hundred years of history of regulating cannabis for agricultural and industrial uses. Then known as "hemp" or "Indian hemp," the first cannabis legislation was passed in 1619 by the Virginia colonial legislative assembly, with each of the other colonies, including Massachusetts Bay Colony, passing their own cannabis laws.

---

[17] Because Verano's operations are deemed illegal under the CSA, the national securities exchanges in the United States will not list Verano's stock.  Verano is listed on a stock exchange in Canada, but in the United States its stock is traded over-the-counter, where stocks suffer from less liquidity and lower valuations than those traded on the national securities exchanges.

47.     By the middle of the 19th century, Americans were using marijuana for medicinal and recreational purposes.  "[C]annabis was widely utilized as a patent medicine" in the 1800s,[18] with druggists and doctors dispensing liquid tinctures and edible candies, then referred to as hashish.  In 1850, the United States Pharmacopoeia listed cannabis as a treatment.[19]  Along with its medicinal uses, marijuana was considered "a pleasurable . . . stimulant."[20]  Below is an advertisement for "hasheesh" from the September 20, 1862, issue of *Vanity Fair*:[21]



> **HASHEESH CANDY.**
>
> A most wonderful Medicinal Agent for the cure of Nervousness, Weakness, Melancholy, Confusion of thoughts, etc.  A pleasurable and harmless stimulant.  Under its influence all classes seem to gather new inspiration and energy.
>
> Price, 25c. and $1 per box.  Beware of imitations.  Imported only by the Gunjah-Wallah Company, 476 Broadway.
>
> On sale by druggists generally.

48.     A decade later, Louisa May Alcott—the author of *Little Women*—described the "new and interesting amusement," marijuana, in an 1876 short story, *Perilous Play*.  After narrating a blissful day of experimenting with marijuana bonbons, the story concludes, "Heaven bless hashish, if its dreams end like this!"

---

[18] Mary Barna Bridgeman & Daniel T. Abazia, *Medicinal Cannabis: History, Pharmacology, and Implications for the Acute Care Setting*, 42(3) Pharmacy & Therapeutics 180, 180 (Mar. 2017).

[19] *Id.* at 180.

[20] Stephen Siff, *The Illegalization of Marijuana: A Brief History*, Ohio State Univ. Stanton Found. (May 2014), https://origins.osu.edu/article/illegalization-marijuana-brief-history?language_content_entity=en.

[21] *Vanity Fair*, vol. 6, no. 143, at 2 (Sept. 20, 1862), *available at* https://books.google.com/books?id=Kk4oAQAAMAAJ&dq=vanity%20fair%201862.

49.     During this period, states began to regulate marijuana's recreational and psychoactive uses.  By 1889, Missouri had made it a crime to "frequent any house, room or place where opium, hasheesh or other deadly drug is smoked, for the purpose of smoking such . . . drugs."[22]  Iowa similarly labelled as "nuisances" in 1896 all "houses resorted to for the use of opium or hasheesh."[23]  The following year, North Dakota, which had already banned alcohol, added to the definition of prohibited "intoxicating liquors," "any . . . liquids which are made, sold or offered for sale as a beverage and which shall contain . . . Indian hemp."[24]  Around the turn of the century, Massachusetts also restricted "Indian hemp" to those holding prescriptions for it.[25]

50.     The federal government, by contrast, restricted its regulation of marijuana to *interstate* measures.  In 1906, Congress passed the Pure Food and Drug Act, which required that medicine shipped in *interstate commerce*, including marijuana-based medicine, must "plainly state[]" its "strength, quality, or purity" on its label.[26]  For drugs manufactured and sold *intrastate*, the act left the regulation to the states.

51.     In the 20th century, public perception of marijuana became infused with racist stereotypes, leading more states to ban the plant.  The Florida Supreme Court, in describing the effects of marijuana, insisted: "Among Asiatic peoples, the dreams produced are usually of an

---

[22] *The Revised Statutes of the State of Missouri, 1889*, ch. 15, art. 8, § 2264, at 627 (1889), *available at* https://books.google.com/books?id=pVoKOd3XJ0oC.

[23] *Acts and Resolutions Passed at the Regular Session of the Twenty-sixth General Assembly of the State of Iowa*, ch. 82, at 79 (1896), *available at* https://books.google.com/books?id=-7oPAQAAIAAJ.

[24] *State v. Virgo*, 14 N.D. 293, 103 N.W. 610, 610 (1905).

[25] Dale Gieringer et al., *Marijuana Medical Handbook: Practical Guide to Therapeutic Uses of Marijuana* 117 (2008).

[26] *Id.*

erotic character . . . ."[27]  The Louisiana Supreme Court likewise claimed that the "[s]ymptoms"

of marijuana use "vary extremely with race."[28]  Well into the 1950s, "reports portray[ed]

marihuana smoking as . . . an activity almost exclusively of unemployed or menially employed

members of racial minorities."[29]

52.     Despite growing pressure for federal action, Congress declined to ban marijuana.

Instead, in 1937, it passed the Marihuana Tax Act of 1937.  "[T]he Act was intended," the

Supreme Court later explained, "merely to impose a very high tax on transfers to nonregistrants

and not to prohibit such transfers entirely."[30]  Congress opted to tax, rather than ban, marijuana

out of concern that the latter would intrude upon the "subject matter reserved to the States under

the tenth amendment."[31]

## IV.   Congress Creates a Closed System of Regulation, Aimed at Eradicating Marijuana from Interstate Commerce, with the Controlled Substances Act.

53.     In 1970, with marijuana already banned in all 50 states, Congress enacted the

Controlled Substances Act as Title II of the Comprehensive Drug Abuse Prevention and Control

Act of 1970.[32]  As originally enacted, the law created "a closed regulatory system making it

unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a

manner authorized by the CSA."[33]  The CSA divided drugs into five schedules, with drugs in

Schedule I, the most severe category, being banned from interstate and intrastate commerce

[27] *Simpson v. State*, 129 Fla. 127, 130–31, 176 So. 515, 516-17 (1937).

[28] *State v. Bonoa*, 172 La. 955, 961, 136 So. 15, 17 (1931).

[29] *Leary v. United States*, 395 U.S. 6, 40-41 (1969).

[30]  *Id.* at 21.

[31] *Taxation of Marihuana: Hearings on H.R. 6385 Before the H. Comm. on Ways and Means*, 75th Cong. at 12 (1937).

[32] *Gonzales v. Raich*, 545 U.S. 1, 10 (2005).

[33] *Id.* at 13.

"with the sole exception being use of the drug as part of a Food and Drug Administration preapproved research study."[34]   Marijuana was placed under Schedule I.  21 U.S.C. § 802(16); *see* 21 U.S.C. 812(c).

## V.      Massachusetts, along with the Vast Majority of States, Legalizes Marijuana Pursuant to Comprehensive Regulations.

54.      The negative public perceptions around marijuana proved to be fleeting.  Starting in the 1990s, several states have returned to the approach of regulating, rather than banning, marijuana.  In 2012, Massachusetts became the eighteenth state to legalize intrastate marijuana for medical purposes.  The Massachusetts program permitted businesses to cultivate, process, and dispense marijuana in-state for medical purposes, subject to strict regulations.  In November 2016, Massachusetts voters approved—by a 54 to 46 margin[35]—the creation of a legalized market for recreational marijuana, restricted to persons over twenty-one years of age (known as "adult use" marijuana).  Both medicinal and adult-use marijuana are regulated by the Commonwealth's Cannabis Control Commission.

55.      Today, the vast majority of states—thirty-eight—have adopted regulated programs for intrastate medical marijuana.  Twenty-three states have created regulated markets for intrastate adult-use marijuana.[36]  The majority of Americans live in states where regulated marijuana is available.

56.      These state-regulated programs serve important purposes for the states and their citizens, including: protecting consumers from adulterated and mislabeled marijuana products;

---

[34] *Id.* at 14.

[35] Martha Bebinger, *Mass. Votes to Legalize Recreational Marijuana*, WBUR (Nov. 9, 2016), https://www.wbur.org/news/2016/11/08/recreational-marijuana-massachusetts-results.

[36] *State Medical Cannabis Laws*, Nat'l Conf. of State Legislatures (last updated June 22, 2023), https://www.ncsl.org/health/state-medical-cannabis-laws.

ensuring that patients have safe access to marijuana as recommended by their healthcare

professionals; protecting minors by restricting marijuana distribution to regulated channels that

enforce age requirements; ending the prosecution and incarceration of people for possession and

consumption of marijuana; reducing violent and organized crime associated with the illicit

market for marijuana; reducing the risk of patients self-medicating with marijuana without

professional medical guidance; and addressing racial and socioeconomic inequities caused by

inconsistent enforcement of drug laws.

57.     Marijuana legalization also provides an important role in state efforts to address

the opioid crisis.  For individuals, marijuana use is "significantly associated with self-assessed

decreases in opioid use."[37]  As a result, states with medical or medical and adult-use marijuana

programs have benefited from a "decline in opioid-related emergency department visits,"[38] and

the presence of state-regulated marijuana dispensaries in an area is "associated with reduced

opioid related death rates, particularly deaths associated with synthetic opioids such as

fentanyl."[39]

58.     To achieve the myriad benefits of marijuana legalization, while protecting

consumers and preventing leakage into the illicit interstate and international markets,

Massachusetts and other states have implemented comprehensive regimes for medical and adult-

use marijuana.  In these states, marijuana is strictly regulated, more strictly than alcohol and most

---

[37] Hudson Reddan et al., *Cannabis Use to Manage Opioid Cravings Among People Who Use Unregulated Opioids During a Drug Toxicity Crisis*, Int'l J. of Drug Pol'y (Sept. 2023), https://www.sciencedirect.com/science/article/abs/pii/S0955395923001603?via%3Dihub.

[38] *Legalized Marijuana Linked to Decline in Opioid Emergencies*, Univ. of Pittsburgh Med. Ctr. (July 12, 2021), https://www.upmc.com/media/news/071221-drake-cannabisrcl.

[39] Greta Hsu & Balaza Kovacs, *Association Between County Level Cannabis Dispensary Counts and Opioid Related Mortality Rates in the United States: A Panel Data Study*, BMJ at 1 (Jan. 27, 2021), https://www.bmj.com/content/372/bmj.m4957.

pharmaceuticals.  By providing a safe and strictly regulated alternative, these state programs have reduced illicit interstate and international commerce in marijuana.

59.     In Massachusetts, the medical and adult-use marijuana programs are currently administered by the Cannabis Control Commission, which sets rules, licenses marijuana businesses, and ensures their compliance with regulations.  Under these regulations, before a marijuana product can be sold to adult consumers or patients, each business in the supply chain for that product must satisfy a rigorous set of regulations governing every step in the process from seed to sale, including cultivation, manufacture, and distribution.

60.     Businesses that wish to participate in Massachusetts' market—including growers, manufacturers, distributors, and couriers—must pass regulatory hurdles at the Commonwealth level and local level.  They must reach an agreement with their local community (known as a "host community agreement") and receive approval from the Cannabis Control Commission. The application process is comprehensive, requiring charter documents, financial statements, character assessments, background checks on owners and individuals responsible for day-to-day operations, exhaustive disclosures on ownership and financing of the business, detailed plans for compliance with regulations and security, extensive operating policies, and proposals for creating a positive impact on communities that have been harmed by the war on drugs. Applicants must provide, among other required submissions, a detailed summary of operating policies and procedures addressing issues such as security, storage, prevention of diversion, transportation, inventory practices, and recordkeeping—all before they can even *begin* operating.

For example, marijuana businesses are required to have a policy of dismissing immediately any employee or agent who diverts marijuana or engages in unsafe practices.[40]

61.     If a business receives a license, it must then comply with the Commonwealth's extensive regulations concerning operations, security, storage, transportation, inventory management, personnel, and more.  Marijuana businesses must have security measures (including physical locks, alarm systems, surveillance systems, and methods to prevent loitering), procedures for restricting access only to specifically authorized personnel, fixed operating hours, storage and waste disposal procedures, quality control procedures, record-keeping procedures, processes for checking customer identification both upon entering the store and prior to any sale, and emergency procedures, among other required safeguards.

62.     One such safeguard is Massachusetts' seed-to-sale tracking system.  This system requires licensed marijuana businesses to "capture everything that happens to an individual Marijuana plant, from seed and cultivation, through growth, harvest and Manufacture of Marijuana Products and MIPs [marijuana-infused products], including transportation, if any, to final sale of finished products." [41]

63.     The seed-to-sale tracking process begins with marijuana cultivators, who must physically tag plants while also electronically tracking them through different stages of development.  Below is a photograph of Wiseacre Farm co-owner Jon Piasecki preparing tags for marijuana plants pursuant to this seed-to-sale tracking program.

---

[40] *See* 935 CMR 500.002 (definition of Marijuana Establishment Agent); 935 CMR 500.105(1)(m).

[41] *Massachusetts Seed-to-Sale Guidance*, Cannabis Control Comm'n at 5 (May 2021), https://masscannabiscontrol.com/wp-content/uploads/2021/05/20210517_Guidance_Seed-to-Sale.pdf (hereinafter "*Seed-to-Sale Guidance*").



(Photo Credit: Ben Garver – The Berkshire Eagle).[42]

64.     The process is painstaking: for example, if a cultivator has seeds that are not

currently being planted, those "immature seeds will be counted and entered into Metrc," the

seed-to-sale system, with the cultivator having to identify the specific strain of the seeds and

their physical location, among other information.[43]  After seeds are planted, cultivators must

continually update the system as the plants advance through their lifecycle from seed, to

immature plant, to flowering plant.  When the plants are harvested, the cultivator must weigh

each plant and enter the plant's "wet weight" into Metrc; any error in entering the weight must

be corrected within 48-hours or else an incident report must be filed with the Cannabis Control

Commission.[44]  If harvesting takes more than one day, the harvester cannot wait until it has

finished harvesting to weigh and enter all the marijuana; it has to enter each plant on the day that

---

[42] Ben Garver, *Jon Piasecki Runs the Smallest Commercial Outdoor Cannabis Farm in the State*, Berkshire Eagle (May 4, 2021), https://www.berkshireeagle.com/jon-piasecki-runs-the-smallest-commercial-outdoor-cannabis-farm-in-the-state/collection_f0915c80-ace3-11eb-bf66-d72d0ad667b8.html.

[43] *Seed-to-Sale Guidance, supra*, at 7.

[44] *Id.* at 8.

it was harvested.[45]  After the marijuana is dried, it undergoes rigorous testing with the results, including potency, entered into the seed-to-sale tracking system.[46]  Once at retail stores, each individual marijuana product must have its own tag for tracking in the seed-to-sale system.[47]  Retailers must record every sale in the system, including the specific employee who conducted each transaction.[48]

65.     This seed-to-sale tracking system creates a transparent and accountable record for tracing marijuana products through every stage of their processing back to the original batch of immature seeds from which they grew.  This system is intended to and does prevent leakage of state-regulated marijuana into illicit interstate commerce.

66.     This seed-to-sale tracking system is also coupled with strict regulations governing every step in the supply chain for regulated marijuana.  Take for example a transaction as simple as transporting marijuana from a processing facility to a retailer.  In almost any other industry, this process would be straightforward: package the product; load it on a truck; and deliver it to the retailer.  Under Massachusetts' regulated marijuana regime, moving marijuana products down the street is a complex, expensive, and highly regimented exercise.

67.     Before any marijuana product can leave its originating facility, it must be entered into the Commonwealth's seed-to-sale tracking system.  The processor must also—on video—weigh, inventory, and account for the marijuana on a manifest required to be filled out in triplicate.[49]  The video not only has to record the process, it must clearly show the weight of each

---

[45] *Id.* at 9.

[46] *See id.* at 12.

[47] *Id.*

[48] *Id.*

[49] *See* 935 CMR 501.105(13)(a)(7), 501.105(13)(f).

product as well as the manifest where the marijuana shipment is recorded.[50]  The marijuana must then be placed in packaging that is sealed, labelled, and tamper resistant or child resistant.[51]  The marijuana processor must also make arrangements with transporters that are specifically licensed to handle marijuana.[52]  Marijuana products may be transported only by agents registered with the Cannabis Control Commission and working for businesses licensed by that Commission.[53]

68.     Once the marijuana is in the hands of the transporting agents, another set of regulations comes into play.  Marijuana products in transit must be accompanied at all times by *two* marijuana agents registered with the Commonwealth.[54]  At least one of those agents must remain with the transportation vehicle at all times during the transport.[55]  Routes and timetables must be randomized for every trip.[56]  Any emergency stops must be logged, stating the reasons for the stop, duration, location, and activities of any personnel that exited the vehicle during the stop.[57]

69.     The vehicles themselves are also subject to strict requirements.  Vehicles transporting marijuana must be equipped with GPS tracking, alarms, a secure communications channel, and multiple cameras that must cover both the storage area and the driver.[58]  Those

---

[50] *Id.* at 501.105(13)(a)(9).

[51] *Id.* at 501.105(13)(a)(10).

[52] *Id.* at 501.105(13)(a)(3).

[53] *Id.*

[54] *Id.* at 501.105(13)(a)(6).

[55] *Id.*

[56] *Id.* at 501.105(13)(a)(12).

[57] *Id.* at 501.105(13)(a)(11).

[58] *Id.* at 501.105(13)(a)(15), 501.105(13)(e).

cameras must be recording at all times during the journey.[59]  The vehicle cannot have any external indication that it is carrying marijuana, and the marijuana mut be kept in a secure, locked storage compartment.[60]  Any vehicle transporting marijuana must be owned or leased directly by a licensed marijuana business, and the vehicle's GPS equipment must be inspected by the Commission before transportation and after any alteration to the vehicle's storage compartment.[61]

70.    Once the marijuana reaches its destination, its journey may have ended but the regulations do not.  The recipient facility must, within eight hours after arrival, repeat the process of weighing, inventorying, and accounting for each marijuana product on video.[62]  If there is a discrepancy, it must be documented and reported to the Cannabis Control Commission and local law enforcement within 24 hours.[63]  If for any reason the shipment cannot be completed, it must be returned to the originating facility.[64]

71.    Marijuana businesses must also invest heavily in surveillance equipment. Businesses must have "commercial grade" video cameras in "all areas that may contain Marijuana or vaults or safes . . . , at all points of entry and exit and in any parking lot."[65]  The cameras must be set up to record under the "normal lighting conditions of the area under

---

[59] *Id.* at 501.105(13)(a)(15).

[60] *Id.* at 501.105(13)(c)(3), 501.105(13)(d).

[61] *Id.* at 501.105(13)(c)(1), 501.105(13)(e).

[62] *Id.* at 501.105(13)(a)(8).

[63] *Id.* at 500.105(13)(b)(1), 500.110(8)(e).

[64] *Id.* at 500.105(13)(a)(5).

[65] *Id.* at 500.110(5)(a).

surveillance" and "shall be angled so as to allow for the capture of clear and certain identification of any Person entering or exiting the Marijuana Establishment or area."[66]

72.     The regulations extend to the cash registers and point-of-sale systems at marijuana establishments, which must be approved by the Cannabis Control System and must be integrated into the seed-to-sale tracking system for marijuana.  Participation in this state-wide, electronic tracking system is a requirement for all marijuana businesses—cultivators, processors, transporters, distributors, and couriers—and it is audited monthly.  In short, the Commonwealth tracks marijuana at every stage of the supply chain from seed to sapling and mature plant, from processing to wholesale distribution, from transit to stocking at the dispensary, and from inventory at dispensaries to its ultimate sale to consumers.  Marijuana sold in Massachusetts is also subject to stringent labelling requirements describing both the type of product and its source.

73.     Marijuana businesses in Massachusetts are also required to ensure that no marijuana is sold, delivered, or distributed by a producer from or to a location outside of Massachusetts, *i.e.*, that marijuana remain *intrastate*.

74.     Together, these extensive regulations serve to protect consumers, prevent sales to minors, and prevent diversion onto the illicit interstate and international markets.

75.     Massachusetts' regulatory regime for marijuana is also aimed at addressing the racial and socioeconomic inequities caused by the war on drugs.  Massachusetts law requires marijuana businesses to commit to promoting the development of communities disproportionately impacted by the war on drugs.  The Commonwealth also has a Social Equity Program administered by the Cannabis Control Commission, which assists underrepresented individuals in joining the state-regulated market.

---

[66] *Id.*

76.     Numerous other states have adopted regimes similar to Massachusetts': requiring licensing of cannabis businesses, labelling of cannabis products, and seed-to-sale electronic tracking of cannabis products.  These state programs provide an alternative to illicit interstate marijuana for patients and adult consumers.  These state-regulated programs operate intrastate: with cultivation, processing, and sales occurring within the state's borders.  Prior to these programs, much of the marijuana in the United States was either imported or travelled interstate (or both).  Today, that illicit interstate marijuana is being displaced with state-regulated, local marijuana.  In Maine, for example, marijuana consumption shifted after legalization to the state-regulated market: about 64% of marijuana in Maine is acquired legally pursuant to the state's medical or adult-use cannabis programs.[67]

77.     The states' medical and adult-use marijuana programs have drastically reduced illicit interstate and international commerce in marijuana.  From 2012 to 2022, the amount of marijuana seized by U.S. Customs and Border Protection declined by almost 95%; from 2021 to 2022 alone, the volume of marijuana seized by the agency declined by around 50%.[68]  By providing a safe and regulated alternative to illicit marijuana, state-regulated marijuana programs are depriving criminal organizations of a major source of illicit revenue.

78.     As illicit interstate marijuana transactions decline, regulated intrastate transactions continue to grow.  On January 27, 2023, the Cannabis Control Commission announced that marijuana businesses in the Commonwealth had surpassed $4,000,000,000 in gross sales since

---

[67] Michael Sofis & Mackenzie Slade, *Maine Office of Cannabis Policy Cannabis Markets & Associated Outcomes – Survey Findings and Implications*, Advocates for Human Potential, at 4, Inc. (Spring 2022), https://www.maine.gov/dafs/ocp/sites/maine.gov.dafs.ocp/files/inline-files/Maine%20OCP%20AHP%20Report%2006-22_0.pdf.

[68] Josh Lee, *Border Patrol Pot Seizures Down*, The Paper (Feb. 10, 2023), https://abq.news/2023/02/border-patrol-pot-seizures-down/.

legalization in 2012.[69]  Two years earlier, the Commonwealth's revenues from marijuana taxes

had exceeded alcohol tax revenues, a milestone also reached by Illinois, Colorado, Washington,

Arizona, Nevada, and California.[70]  In Massachusetts, adult-use marijuana transactions are

subject to four categories of taxation: a 6.25% sales tax; a 10.75%  excise tax; local taxes of up

to 3%; and community impact fees of up to 3%.[71]  Marijuana businesses provide further

contributions to the Commonwealth in income taxes.

## VI.  Congress and the Executive Branch Abandon the CSA's Closed Regulatory Approach to Marijuana.

79.    Faced with this overwhelming shift among the States toward local regulation of

marijuana, the substantial state and local tax revenues they generate, and the compelling state-

interests served by those local programs, Congress has taken steps to reduce federal interference

in state-regulated marijuana programs.  By doing so, Congress has abandoned the closed

regulatory system of the original CSA.

80.    In 2014, Congress passed the "Consolidated and Further Continuing

Appropriations Act, 2015," which forbade the Department of Justice from enforcing the CSA

---

[69] Press Release, Cannabis Control Comm'n (Jan. 27, 2023), https://masscannabiscontrol.com/2023/01/massachusetts-marijuana-establishments-surpass-4-billion-in-gross-sales/.

[70] Kyle Jaeger, *Massachusetts Marijuana Tax Revenue Now Exceeds Alcohol by Millions*, Marijuana Moment (Jan. 24, 2022), https://www.marijuanamoment.net/massachusetts-marijuana-tax-revenue-now-exceeds-alcohol-by-millions/; Reid Wilson, *Pot Taxes Surpass Those from Alcohol in Legalization States* (Apr. 25, 2022), https://thehill.com/homenews/state-watch/3462636-pot-taxes-surpass-those-from-alcohol-in-legalization-states/.

[71] *Taxes and Fees*, Cannabis Control Comm'n (last visited Sept. 8, 2023), https://masscannabiscontrol.com/taxes-and-fees/.

when doing so would be inconsistent with state medical marijuana laws.[72]  Each successive appropriations bill has included a similar carveout for state medical marijuana programs.[73]

81.     During this same period, Congress has also permitted, by not interfering with, the legalization of medical marijuana in the District of Columbia, as well as medical or adult-use marijuana legalization in several territories, including Guam, Puerto Rico, the U.S. Virgin Islands, and the Northern Mariana Islands.

82.     The Executive Branch has also taken steps to avoid interfering with state efforts to regulate marijuana.  On August 29, 2013, United States Deputy Attorney General James Cole issued a memorandum titled "Guidance Regarding Marijuana Enforcement."  The memorandum, which has come to be known as the Cole Memorandum, directed prosecutors not to prioritize enforcing the CSA against persons engaged in intrastate possession, cultivation, and distribution of marijuana consistent with robust state regulatory regimes:

> The enactment of state laws that endeavor to authorize marijuana production, distribution, and possession by establishing a regulatory scheme for these purposes affects this traditional joint federal-state approach to narcotics enforcement.  The Department's guidance in this memorandum rests on its expectation that states and local governments that have enacted laws authorizing marijuana-related conduct will implement strong and effective regulatory and enforcement systems that will address the threat those state laws could pose to public safety, public health, and other law enforcement interests.[74]

---

[72] Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113–235, § 538, 128 Stat. 2130, 2217 (113th Cong. 2014).

[73] Consolidated Appropriations Act, 2016, Pub. L. No. 114-113 (114th Cong. 2015); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31 (115th Cong. 2017); Consolidated Appropriations Act, 2018, Pub. L. No. 115-141 (115th Cong. 2018); Consolidated Appropriations Act, 2019, Pub. L. No. 116-6 (116th Cong. 2019); Consolidated Appropriations Act, 2020, Pub. L. No. 116-93 (116th Cong. 2019); Consolidated Appropriations Act, 2021, Pub, L. No. 116-260 (116th Cong. 2020); and Consolidated Appropriations Act, 2022, Pub. L. No. 117-103 (117th Cong. 2022).

[74] Deputy Attorney General James M. Cole, Memorandum for all United States Attorneys: Guidance Regarding Marijuana Enforcement, at 2 (Aug. 29, 2013).

83.     While the Cole Memorandum was later rescinded by Attorney General Jeff
Sessions, his successor, William Barr insisted that he would not "go after companies that rely on
the Cole Memorandum."[75]  This position has continued under Defendant Merrick Garland,
whose policy has been not to "pursue prosecutions of those who are complying with the laws in
states that have legalized and are effectively regulating marijuana."[76]

## VII.   The CSA Interferes with States' Ability to Develop Safe Intrastate Markets for Marijuana.

84.     Despite the federal government's abandonment of the CSA's original goal to
eradicate commercial transactions in marijuana, the CSA continues to prohibit state-regulated
marijuana companies from manufacturing, distributing, dispensing, or even possessing marijuana
in intrastate commerce.  21 U.S.C. § 841(a).  This prohibition is to the detriment of the states,
their citizens, and Plaintiffs.  Not only do Plaintiffs face the potential risk of enforcement, their
businesses also face numerous hurdles that result directly from the CSA's treatment of intrastate
marijuana.

85.     Intrastate cultivators and distributors of marijuana, including Plaintiffs, require
access to goods and services from other businesses to function and grow.  However, because
state-regulated marijuana businesses are illegal under the CSA, businesses that work with or
provide services to Plaintiffs (or any state-regulated marijuana business) risk prosecution for
aiding and abetting, conspiracy, and money laundering.

---

[75] Jacqueline Thomsen, *Barr: I Wouldn't Go after Businesses Relying on Obama-Era Marijuana Policy*, The Hill (Jan. 15, 2019), https://thehill.com/homenews/senate/425466-barr-i-wouldnt-go-after-businesses-relying-on-obama-era-marijuana-policy/.

[76] Senate Committee on the Judiciary, The Nomination of the Honorable Merrick Brian Garland to be Attorney General of the United States: Responses to Questions for the Record to Judge Merrick Garland, Nominee to be United States Attorney General, 117th Cong., 1st sess., 23-25 (Feb. 2021).

86.     Companies that work with state-regulated marijuana businesses also risk losing valuable federal benefits, including Small Business Administration loans.  In 2018, the Small Business Administration announced that any business deemed an "Indirect Marijuana Business" would be "ineligible" for "financial assistance" from the agency.[77]  Under the agency's definition, an "Indirect Marijuana Business" includes any "business that derived any of its gross revenue from the previous year . . . from sales to [state-regulated marijuana businesses] of products or services that could reasonably be determined to support the use, growth, enhancement or other development of marijuana."[78]  This prohibition, the Small Business Administration warned, also means that loan-recipients "may not lease space to a business that is engaged in any activity that is illegal under federal" law, including state-regulated marijuana activities.[79]

87.     Working with state-regulated marijuana companies also puts farmers at risk of losing federal benefits.  The Cannabis Control Commission has warned: "Farmers may find that that federal services may be withheld, even for non-marijuana crops, if a farmer engages in marijuana cultivation on their property."[80]

88.     Because of these risks that come with providing goods or services to, or leasing property to, a state-regulated marijuana company, many organizations refuse to work with state-

---

[77] *Revised Guidance on Credit Elsewhere and Other Provisions in SOP 50 10 5(J)*, Small Business Administration, Policy Notice 5000-17057 (Apr. 3, 2018), https://www.sba.gov/document/policy-notice-5000-17057-revised-guidance-credit-elsewhere-other-provisions-sop-50-10-5j.

[78] *Id.*

[79] *Id.*

[80] *Guidance for Farmers*, Cannabis Control Comm'n at 10 (Aug. 2021), https://masscannabiscontrol.com/wp-content/uploads/2020/01/Guidance-for-Farmers.pdf.

regulated marijuana companies.  State-regulated marijuana businesses therefore have limited

options for everything from leasing property to making job postings.

89.     These limitations extend to financial services as well.  Along with the risks

described above, transacting with state-regulated marijuana businesses puts financial institutions

at risk of criminal, civil, or regulatory enforcement actions under the Bank Secrecy Act.  As a

result, many financial institutions, including credit card processors and securities exchanges,

refuse to serve state-regulated marijuana businesses.

90.     But for the CSA, Plaintiffs would have access to the full range of financial

services available to other manufacturers and distributors in the United States.

91.     Lack of access to financial services curtails Plaintiffs' business in multiple ways.

It raises their cost of capital by lowering their ability to obtain credit.  It raises their operating

costs by increasing their insurance premiums (Massachusetts marijuana businesses must have

insurance, but many insurers will not work with state-regulated marijuana companies due to the

CSA).  It restricts their ability to lease or acquire vehicles and real estate.  The banks or credit

unions that are willing to work with state-regulated marijuana companies often impose

requirements, such as limits on total deposits, higher interest rates, or marijuana-specific fees.

92.     These restrictions hamper not just bigger companies, but also smaller businesses,

including those run by minority and women entrepreneurs, including Canna Provisions and Mr.

Sellers' businesses.  By making it more difficult for minorities, women, and veterans to enter,

and succeed, in state-regulated marijuana businesses, the federal government is undermining

Massachusetts' and other states' efforts to use marijuana regulation as an engine for social

equity.

93.     These financial restrictions also mean that those marijuana businesses that are able to get off the ground must operate largely as cash businesses.  Credit cards are not an option, and Mastercard recently announced that it would forbid processing of even debit card transactions involving marijuana.[81]  Visa also forbids cashless ATM transactions involving marijuana.  Mastercard and Visa have adopted these policies not out of any animus against marijuana—indeed, credit card companies readily process marijuana transactions in Canada. Instead, Mastercard and Visa have adopted policies against state-regulated marijuana businesses because those businesses are considered illegal under federal law.  These policies by credit card processors reduce the number of potential customers for state-regulated marijuana businesses and the amount customers are willing to spend.

94.     Lack of access to financial services creates enormous public safety risks, as criminals know to target these largely cash-based businesses.  This risk is encountered daily by marijuana retailers and couriers.  While online pre-payment is a standard part of modern delivery services, marijuana businesses lack access to the credit card processors necessary for online payments.  As a result, couriers must visit customers not knowing whether that customer actually intends to buy the product.  Plaintiffs' businesses have therefore had to invest in safety measures that typical businesses—who have access to banking—do not.  Here too, the CSA presents an obstacle, as federal law prohibits (on pain of severe mandatory minimum sentences) the carrying of a firearm while committing, or furthering, CSA violations.[82]  Plaintiffs are therefore unable to

---

[81] Dario Sabaghi, *Mastercard Cracks Down on Marijuana Transactions on Its Debit Cards*, Forbes (July 27, 2023), https://www.forbes.com/sites/dariosabaghi/2023/07/27/mastercard-cracks-down-on-marijuana-transactions-on-its-debit-cards/.

[82] *See* 18 U.S.C. § 942.

provide armed guards for their businesses, even when doing so would be advisable and in the best interests of employee and customer safety.

95.     Plaintiffs also face numerous other harms caused by the CSA's overreach.  For example, a central goal of Mr. Sellers's marijuana entrepreneurship is to provide a service to underserved communities; however, the CSA's ban on intrastate marijuana has led to a prohibition on delivering marijuana to persons residing in federal housing.  As a result, marijuana couriers cannot make deliveries to those addresses and must regularly cross-check any delivery requests against a database of federal housing.  But for the CSA, Mr. Sellers's courier service would be able to expand to serve customers in federal housing.

96.     State-regulated marijuana businesses also lack protections under the federal bankruptcy laws and federal trademark laws.  By being cut off from these rights afforded to every other business, Plaintiffs face more difficulties in obtaining financing and in protecting their intellectual property.

97.     The CSA's ban on intrastate marijuana also creates onerous tax penalties for state-regulated marijuana businesses.  Because their activities are deemed "trafficking in controlled substances (within the meaning of schedule I and II of the Controlled Substances Act)," Section 280E of the Internal Revenue Code prohibits those businesses from claiming any deductions or credits on their federal taxes.  Even the most basic deductions for ordinary and necessary business expenses—such as employee salaries, rent payments, and interest payments on debt— are prohibited.  As a result, state-regulated marijuana businesses effectively pay taxes on their gross proceeds, rather than net profits.  The consequences of this prohibition are devastating for the industry, particularly for small businesses that cannot rely on diversification or economies of scale.

**CLAIMS FOR RELIEF**

**First Cause of Action (Const. art. I & amend. IX, X)**
**Declaratory Judgment that the CSA as Applied to Plaintiffs Exceeds Congress's Authority**
**Under the Commerce Clause and Necessary and Proper Clauses.**

98.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the foregoing paragraphs.

99.     The CSA prohibits the intrastate cultivation, manufacture, possession, and distribution of marijuana.

100.    Plaintiffs' businesses involve the intrastate cultivation, manufacture, possession, and distribution of marijuana, pursuant to state law.

101.    There exists a controversy between Plaintiffs and Defendant as to whether the CSA is within Congress's authority as applied to the intrastate cultivation, manufacture, possession, and distribution of marijuana pursuant to state law.

102.    While the CSA was originally enacted as part of a comprehensive effort by Congress to eliminate marijuana from commerce by adopting a closed system of regulation, Congress has since abandoned that goal.

103.    The marijuana that state-regulated marijuana businesses cultivate, manufacture, possess, and distribute pursuant to state law is not fungible with, and is distinguishable from, marijuana that has travelled in illicit interstate and international commerce.

104.    The comprehensive regulatory programs in Massachusetts and other states have a net negative effect on the amount of marijuana in interstate commerce and therefore do not interfere with Congress's efforts to ban interstate marijuana.  Instead, these state programs support the federal effort to reduce illicit interstate and international commerce in marijuana.

105.    The CSA's interference with Massachusetts' and other states' intrastate marijuana markets is neither necessary nor proper for accomplishing any interstate regulatory goal.

106.     The CSA, as applied to Plaintiffs' intrastate cultivation, manufacture, possession, and distribution of marijuana pursuant to state law, is therefore outside Congress's authority under Article I of the Constitution and violates Amendments IX and X of the Constitution.

**<u>Second Cause of Action (Const. amend. V)</u>**
**Declaratory Judgment that the CSA as Applied to Plaintiffs Violates Due Process.**

107.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the foregoing paragraphs.

108.     At the time of the founding, through the ratification of the Fourteenth Amendment, and for most of the twentieth century, intrastate marijuana regulation remained the exclusive purview of the states, subject only to federal taxes and laws governing marijuana that had been transported in interstate or foreign commerce.

109.     In 1970, Congress, for the first time, banned intrastate marijuana.

110.     Today, the vast majority of states have exercised their police power to legalize marijuana for medical or medical and adult use, subject to regulations related to health, safety, and public welfare.  Marijuana has also been legalized and regulated in the District of Columbia and most federal territories.

111.     The right to cultivate, manufacture, possess, and distribute marijuana, subject only to state health, safety, and public welfare regulations, is deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty.

112.     Plaintiffs are in the business of cultivating, manufacturing, possessing, and distributing marijuana, pursuant to state law.

113.     By regulating intrastate marijuana in states where it is otherwise legal, the CSA deprives Plaintiffs of their right to be free of unwarranted and unlawful federal government intrusion into their activities, in violation of the Fifth Amendment.

114.    Additionally, by regulating intrastate marijuana in states where it is otherwise legal, and without basis under Article I, the CSA deprives Plaintiffs of their liberty without due process, in violation of the Fifth Amendment.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Issue a declaratory judgment that the Controlled Substances Act is unconstitutional as applied to the intrastate cultivation, manufacture, possession, and distribution of marijuana pursuant to state law;

B.    Permanently enjoin Defendant from enforcing the CSA (either alone or in conjunction with any other federal law such as the Bank Secrecy Act) in a manner that interferes with the intrastate cultivation, manufacture, possession, and distribution of marijuana, pursuant to state law;

C.    Award costs and attorneys' fees to Plaintiffs; and

D.    Award any such other and further relief as may be just and proper.

Dated: October 26, 2023                    Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**          **LESSER, NEWMAN, ALEO & NASSER LLP**

*Pro Hac Vice Motions to Be Filed*

David Boies                              /s/ Michael Aleo
333 Main Street                          Michael Aleo
Armonk, NY 10504                         Thomas Lesser
(914) 749-8200                           39 Main Street, Suite 1
dboies@bsfllp.com                        Northampton, MA  01060
                                         Telephone:  (413) 584-7331
Jonathan D. Schiller                     Facsimile:  (413) 586-7076
Matthew L. Schwartz                      aleo@LNN-law.com
David Barillari                          lesser@LNN-law.com
55 Hudson Yards
New York, NY 10001                       *Attorneys for the Plaintiffs Canna Provisions,*
(212) 446-2300                           *Inc., Gyasi Sellers, Wiseacre Farm, Inc., and*
jschiller@bsfllp.com                     *Verano Holdings Corp.*

mlschwartz@bsfllp.com
dbarillari@bsfllp.com

Joshua I. Schiller
44 Montgomery Street
41st Floor
San Francisco, CA 94104
(415) 293-6899
jischiller@bsfllp.com

*Attorneys for the Plaintiffs Canna Provisions,*
*Inc., Gyasi Sellers, Wiseacre Farm, Inc., and*
*Verano Holdings Corp.*