**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, WESTERN DIVISION**

---

CANNA PROVISIONS, INC., GYASI
SELLERS, WISEACRE FARM, INC.,
VERANO HOLDINGS CORP.,

        Plaintiffs,


MERRICK GARLAND, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
THE UNITED STATES,

        Defendant.

---

Case No. 23-cv-30113

Hon. Mark G. Mastroianni

Leave to file granted on March 14, 2024

**PLAINTIFFS' MEMORANDUM OF LAW
<u>IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 3

I.    The Ongoing Harms Imposed on Plaintiffs Create Article III Standing .......................... 3

    A.    Plaintiffs' Economic Injuries and the Threat of Enforcement Satisfy the Injury Element. ........................................................................................................ 3

    B.    Plaintiffs Have Shown Causation Because the Injuries They Suffered Are "Fairly Traceable" to Defendant's Conduct ........................................................ 5

        1.    Plaintiffs Face a Credible Threat of Enforcement Caused by Defendant's Position on the CSA ............................................................ 5

        2.    Plaintiffs' Economic Injuries Are Caused by the Predictable Effect of Defendant's Enforcement Threats on Third Parties ..................................... 5

        3.    Plaintiffs Have Standing to Sue Based on the Injuries Caused Under Other Statutes When the CSA Is Applied to State-Regulated Marijuana. ...... 9

    C.    The Relief Sought in the Complaint Would Redress Plaintiffs' Injuries. .................. 9

II.    The Federal Government's Current Regulation of Intrastate Marijuana Fails Under the *Gonzales v. Raich* Test, and Thus Exceeds the Constitution's Limits on Federal Authority. ...................................................................................................... 11

    A.    *Raich* Permits Congress to Regulate Intrastate Marijuana Only Where Such Regulation Is Necessary and Proper to Serve an Interstate Regulatory Goal ........... 11

    B.    The Underlying Legislative and Operative Facts Have Changed Since *Raich*. ....... 15

        1.    Congress No Longer Seeks to Ban Interstate Marijuana in Its Entirety, Nor Does Congress Believe That Banning Intrastate Marijuana Is Necessary to Achieve the CSA's Goals. ....................................................... 15

        2.    State-Regulated Marijuana Programs Have Reduced Interstate Traffic in Marijuana. ................................................................................................ 17

        3.    State-Regulated Marijuana Is Not Fungible with Illicit Interstate Marijuana, and Permitting the Former Does Not Prevent Regulating the Latter. ....................................................................................................... 18

    C.    Today's New Marijuana Regime Fails Under the *Raich* Test. ................................ 20

    D.    The Court Has the Authority and Obligation to Determine How *Raich's* Holding Applies to the Current Facts of This Case. ........................................................... 23

III.    The CSA Deprives Plaintiffs of Their Fifth Amendment Due Process Rights. .............. 24

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Ayotte v. Planned Parenthood of N. New England,*
546 U.S. 320 (2006) ..................................................................................................... 23

*Bais Yaakov of Spring Valley v. ACT, Inc.,*
798 F.3d 46 (1st Cir. 2015) ......................................................................................... 23

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................................... passim

*Bond v. United States,*
572 U.S. 844 (2014) ..................................................................................................... 11

*California v. Texas,*
593 U.S. 659 (2021) ....................................................................................................... 9

*Commonwealth v. Richardson,*
94 N.E.3d 819 (Mass. 2018) ....................................................................................... 18

*Dep't of Com. v. New York,*
139 S. Ct. 2551 (2019) ................................................................................................... 8

*Gianfrancesco v. Town of Wrentham,*
712 F.3d 634 (1st Cir. 2013) ......................................................................................... 4

*Godbolt v. Worrall,*
2021 WL 6200508 (D. Mass. May 11, 2021) .............................................................. 5

*Gonzales v. Oregon,*
546 U.S. 243 (2006) ..................................................................................................... 22

*Gonzales v. Raich,*
545 U.S. 1 (2005) .................................................................................................... passim

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.,*
452 U.S. 264 (1981) ..................................................................................................... 14

*Houlton Citizens' Coal. v. Town of Houlton,*
175 F.3d 178 (1st Cir. 1999) ......................................................................................... 4

*In re TelexFree Sec. Litig.,*
626 F. Supp. 3d 253 (D. Mass. 2022) ........................................................................... 6

*Int'l Game Tech. PLC v. Garland,*
628 F. Supp. 3d 393 (D.R.I. 2022) ............................................................................... 5

*Keirton USA, Inc. v. United States,*
600 F. Supp. 3d 1270 (Ct. Int'l Trade 2022) ............................................................... 8

*Kyle-Labell v. Selective Serv. Sys.,*
364 F. Supp. 3d 394 (D.N.J. 2019) ............................................................................. 24

*Larson v. Valente,*
456 U.S. 228 (1982) ..................................................................................................... 10

*Lawrence v. Texas,*
539 U.S. 558 (2003) ..................................................................................................... 25

*Leary v. United States,*
    395 U.S. 6 (1969) ................................................................................................. 15

*Milnot Co. v. Richardson,*
    350 F. Supp. 221 (N.D. Ill. 1972) ...................................................................... 24

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) .............................................................................. 11, 14, 22

*Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine,*
    45 F.4th 542 (1st Cir. 2022) ............................................................ 2, 16, 17, 20

*New Hampshire Right to Life Pol. Action Comm. v. Gardner,*
    99 F.3d 8 (1st Cir. 1996) ....................................................................................... 5

*Parsons v. U.S. Dep't of Just.,*
    801 F.3d 701 (6th Cir. 2015) ........................................................................... 8, 10

*Printz v. United States,*
    521 U.S. 898 (1997) ........................................................................................ 11, 22

*Raich v. Gonzales,*
    500 F.3d 850 (9th Cir. 2007) ............................................................................... 25

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.,*
    490 U.S. 477 (1989) .............................................................................................. 23

*Roper v. Simmons,*
    543 U.S. 551 (2005) .............................................................................................. 24

*SBT Holdings, LLC v. Town of Westminster,*
    547 F.3d 28 (1st Cir. 2008) .................................................................................... 4

*Schaer v. Newell Brands Inc.,*
    No. 3:22-CV-30004-MGM, 2023 WL 2033765 (D. Mass. Feb. 16, 2023).......... 4

*Shelby Cty. v. Holder,*
    570 U.S. 529 (2013) ...................................................................................... 15, 20

*Standing Akimbo, LLC v. United States,*
    141 S. Ct. 2236 (2021) .............................................................................. 20, 21, 22

*Stanford v. Kentucky,*
    492 U.S. 361 (1989) .............................................................................................. 24

*State ex rel. Simmons v. Roper,*
    112 S.W.3d 397 (Mo. 2003) ................................................................................ 24

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ................................................................................................ 4

*United States v. Assorted Drug Paraph. Valued at $29,627.07,*
    2018 WL 6630524 (D.N.M. Dec. 19, 2018) ......................................................... 1

*United States v. Carolene Prod. Co.,*
    304 U.S. 144 (1938) .............................................................................................. 15

*United States v. Comstock,*
    560 U.S. 126 (2010) ...................................................................................... 14, 21

*United States v. Darby,*
  312 U.S. 100 (1941)........................................................................................ 20

*United States v. Diaz,*
  519 F.3d 56 (1st Cir. 2008).............................................................................. 23

*United States v. Guess,*
  216 F. Supp. 3d 689 (E.D. Va. 2016) .............................................................. 21

*United States v. Lopez,*
  514 U.S. 549 (1995)........................................................... 11, 13, 14, 18

*United States v. Maxwell,*
  446 F.3d 1210 (11th Cir.2006) ................................................................... 13, 17

*United States v. Morrison,*
  529 U.S. 598 (2000).......................................................................................... 11

*United States v. Nascimento,*
  491 F.3d 25 (1st Cir. 2007).......................................................................... 19, 20

*United States v. Poulin,*
  631 F.3d 17 (1st Cir. 2011).......................................................................... 19, 20

*Washington v. Glucksberg,*
  521 U.S. 702 (1997).......................................................................................... 24

*Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council,*
  589 F.3d 458 (1st Cir. 2009).............................................................................. 6

*Wieland v. U.S. Dep't of Health & Hum. Servs.,*
  793 F.3d 949 (8th Cir. 2015) ......................................................................... 8, 10

*Wiener v. MIB Grp., Inc.,*
  86 F.4th 76, 83 (1st Cir. 2023) ................................................................... 3, 4, 5

*Wine & Spirits Retailers, Inc. v. Rhode Island,*
  418 F.3d 36 (1st Cir. 2005)........................................................................... 6, 25

**Statutes**

7 U.S.C. § 1639o.............................................................................................. 19

18 U.S.C. § 924................................................................................................ 6, 9

21 U.S.C. § 802................................................................................................. 19

410 Ill. Comp. Stat. Ann. 705/30-30.................................................................. 17

**Constitutional Provisions**

U.S. Const., Amendment V ................................................................................ 24

U.S. Const., Art. I, § 8 ..................................................................................... 11

# INTRODUCTION

Plaintiffs operate businesses that grow, process, transport, and sell marijuana entirely within Massachusetts, pursuant to a comprehensive state regulatory program. Defendant, however, deems these local, state-regulated activities illegal under the Controlled Substances Act ("CSA") and publishes warnings that those activities can be prosecuted and "may serve as the basis for the prosecution of other crimes, such as those prohibited by the money laundering statutes."[1] Defendant has even pursued civil forfeiture merely because an entity transported cash for state-regulated marijuana dispensaries.[2] Defendant's position disregards the Constitution's limits on federal authority, subjects Plaintiffs to an ongoing threat of prosecution, and coerces third-parties not to work with Plaintiffs.

Two decades ago, the Supreme Court held in *Gonzales v. Raich*, 545 U.S. 1 (2005), that Congress could regulate intrastate marijuana only where such regulation is necessary and proper to serve an interstate regulatory goal. In 2005, Congress's regulation of marijuana passed that test: Congress was intent on eradicating interstate marijuana, and the factual circumstances that existed in 2005 supported the Government's position that banning intrastate marijuana was necessary for achieving that goal. But that legislative and factual landscape no longer exists. It has changed in the intervening 18 years in ways that even the most ardent advocates of marijuana reform in 2005 would never have imagined possible.

After *Raich*, Congress and the executive branch began abandoning their efforts to eliminate marijuana from the country. As the First Circuit recently held, "the CSA was not Congress's last word

---

[1] *See* Memorandum re Marijuana Enforcement from Jefferson B. Sessions, Att'y Gen., to U.S. Att'ys at 1 (Jan. 4, 2018) ("Sessions Memo"), https://www.justice.gov/media/932456/dl, attached as Ex. A to Declaration of Joshua Schiller ("Schiller Decl."). All internal quotations or citations are omitted unless otherwise noted.

[2] Complaint, *United States v. $165,620 in U.S. Currency*, No.21-01215, ECF No. 1, Ex. A ¶¶ 3–8 (D. Kan. Sept. 3, 2021) (seeking civil forfeiture against company for transporting cash for state-regulated marijuana dispensaries, on the basis that the cash derived from CSA violations), attached as Ex. B to Schiller Decl.; *see also United States v. Assorted Drug Paraph. Valued at $29,627.07*, 2018 WL 6630524, at *1 (D.N.M. Dec. 19, 2018) (obtaining civil forfeiture judgment over marijuana paraphernalia in New Mexico despite marijuana being legalized there).

on the market in marijuana." *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542, 549 (1st Cir. 2022). In 2010, Congress permitted the District of Columbia's medical marijuana law to go into effect. Compl. ¶ 24. The Department of Justice ("DOJ") followed in 2013, issuing a memorandum (the "Cole Memo") stating that it was not a priority to prosecute persons for acting pursuant to state-regulated marijuana programs. *See id*. ¶ 26. While that memo was later rescinded and replaced by the Sessions Memo, which threatens prosecution for participating in, or enabling, state-regulated marijuana activities, DOJ officials, including Defendant, have expressed that such prosecutions are not a priority. *See id.* Then, in 2014, Congress passed the Rohrabacher-Farr Amendment, which bars the DOJ from prosecuting persons for possessing, cultivating, or distributing medical marijuana pursuant to state law. *See id.* ¶ 25. That amendment has been renewed every year since. *Id.* ¶ 80.[3]

Meanwhile, dozens of states have implemented programs to legalize and regulate medical or adult-use marijuana. In 2016, Massachusetts voters approved a measure to legalize the cultivation and distribution of adult-use marijuana (having previously legalized it for medical use). Compl. ¶ 7. Today, almost every state permits some form of marijuana that is illegal under federal law, and the majority of the nation's population lives in states where both medical and adult-use marijuana is legal. *Id.* ¶¶ 8, 55. These programs have evolved substantially from the medical marijuana program at issue in *Raich*, which did not impose controls to prevent marijuana from being diverted into interstate commerce. Now, in Massachusetts, and other states where marijuana can be cultivated for sale, those activities are subject "to labelling and tracking requirements" that create "a transparent and accountable record for tracing marijuana products through every stage of their processing." *Id.* ¶¶ 22, 65. These controls prevent

---

[3] Notwithstanding the amendments, the DOJ has sought civil forfeitures for CSA violations related to state-regulated marijuana, *see supra* n.2, and continues to threaten actions against entities that participate in state-regulated marijuana programs, *see* Sessions Memo at 1; DOJ - Drug Enforcement Administration, *Guidance to Pharmacies on the Dispensing of Certain Tetrahydrocannabinols* (Nov. 27, 2023) (warning pharmacies that dispensing marijuana pursuant to state law violates the CSA), attached as Ex. C to Schiller Decl.

diversion and differentiate state-regulated marijuana products "from each other and from illicit interstate marijuana." *Id.* ¶ 22. By providing consumers with safe, regulated, and local access to marijuana, Massachusetts and other states have reduced illicit interstate commerce, as customers switch to purchasing state-regulated marijuana over illicit interstate marijuana. *Id.* ¶¶ 77–78.

Given these and other charges outlined below, the federal government no longer has any basis for insisting that state-regulated, intrastate marijuana must be banned to serve Congress's interstate goals.

The CSA's prohibition on state-regulated marijuana also now fails under the Fifth Amendment. The ground-shaking shifts in marijuana regulation since *Raich*, together with the nation's long history of marijuana cultivation and use prior to the CSA, demonstrate the widely-held understanding that Plaintiffs' marijuana activities implicate a liberty interest that requires protection. Against this standard, or even the more lenient rational-basis review, the current federal approach to intrastate marijuana fails.

## ARGUMENT

### I.   The Ongoing Harms Imposed on Plaintiffs Create Article III Standing.

Defendant seeks to avoid the merits of Plaintiffs' case by questioning their standing, but Plaintiffs have met the "minimal" burden at the pleading stage to allege "sufficient facts to plausibly demonstrate" Article III standing. *Wiener v. MIB Grp., Inc.*, 86 F.4th 76, 83, 85 (1st Cir. 2023) (reversing dismissal because plaintiff met "minimal plausibility" test for standing). As set out below, Plaintiffs' allegations demonstrate each element of standing: "(i) that [plaintiffs] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* at 84.

### A.   Plaintiffs' Economic Injuries and the Threat of Enforcement Satisfy the Injury Element.

The first element of standing, "injury in fact," merely requires that plaintiffs have suffered "an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or

imminent, not conjectural or hypothetical." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).  Plaintiffs have shown injury under two independent theories: economic harms and the threat of prosecution.

First, Plaintiffs have shown injury in fact due to the myriad financial harms that they have suffered because Defendant deems their business activities illegal under the CSA.  Among other things, they have no access to credit card processing, have limited access to banks, are ineligible for certain loans, are charged higher fees, are unable to keep armed security, and cannot provide normal benefits to their employees.  *See, e.g.*, Compl. ¶¶ 12–14, 36, 40–41, 43, 45.  These financial injuries are a "paradigmatic" form of injury in fact.  *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 638 (1st Cir. 2013); *see also SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 37 (1st Cir. 2008) (plaintiffs suffered injury-in-fact due to actions taken against their business, which caused them "direct and consequential financial harm").  Plaintiffs' economic harms easily satisfy the "minimal plausibility standard for pleading an Article III injury." *Wiener*, 86 F.4th at 85.  "After all, a relatively small economic loss—even an identifiable trifle—is enough to confer standing." *Schaer v. Newell Brands Inc.*, No. 3:22-CV-30004-MGM, 2023 WL 2033765, at *1 (D. Mass. Feb. 16, 2023).[4]

Second, Plaintiffs are injured for the independent reason that they themselves face a threat of prosecution by Defendant under the CSA.  A plaintiff can "satisf[y] the injury-in-fact requirement" when (1) plaintiff has "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) the conduct is "proscribed by statute," and (3) "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  A credible threat of enforcement exists, despite the DOJ statements that state-regulated marijuana participants are not an enforcement priority, because the DOJ has "refused to disclaim the possibility of [future] enforcement"

---

[4] The Complaint demonstrates standing for each Plaintiff; however, "When one of several co-parties (all of whom make similar arguments) has standing, [a court] need not verify the independent standing of the others." *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 183 (1st Cir. 1999).

of the CSA and because the DOJ's "defense of [the statute] indicates that they will someday enforce it." *New Hampshire Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 17 (1st Cir. 1996); *see Int'l Game Tech. PLC v. Garland*, 628 F. Supp. 3d 393, 400 (D.R.I. 2022) (noting the "background assumption" that the government "will enforce its own non-moribund criminal laws, absent evidence to the contrary").

The Court also "may look beyond the pleadings" to confirm this credible threat. *Godbolt v. Worrall*, 2021 WL 6200508, at *2 (D. Mass. May 11, 2021). For example, under Defendant's leadership, the DOJ (1) initiated a civil forfeiture proceeding against a logistics company for transporting cash for state-regulated marijuana dispensaries, *supra* n.2, (2) kept in place the Sessions Memo, which states that Plaintiffs' activities could lead to prosecutions, *supra* n.1, and (3) warned last year that participating in state medical marijuana programs would violate the CSA, *supra* n.3. Plaintiffs thus satisfy the "minimal plausibility" requirement of alleging injury from threat of enforcement. *Wiener*, 86 F.4th at 85.

## B. Plaintiffs Have Shown Causation Because the Injuries They Suffered Are "Fairly Traceable" to Defendant's Conduct.

Plaintiffs satisfy the second element of Article III standing because there is a plausible "causal connection" between Plaintiffs' injuries and Defendant's threat of enforcement of the CSA, rendering Plaintiffs' injuries "fairly traceable to the challenged action of the defendant." *Bennett*, 520 U.S. at 167.

### 1. Plaintiffs Face a Credible Threat of Enforcement Caused by Defendant's Position on the CSA.

Because Plaintiffs themselves face a credible threat of prosecution by Defendant under the CSA, *see* Part I.A, *supra*, their "injury can be traced to the existence and threatened enforcement of the challenged statute[]," thus satisfying the "second . . . prong[]" of standing. *Gardner*, 99 F.3d at 13.

### 2. Plaintiffs' Economic Injuries Are Caused by the Predictable Effect of Defendant's Enforcement Threats on Third Parties.

As to Plaintiffs' economic injuries, "Article III standing does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it only requires that those

injuries be fairly traceable to the defendant." *In re TelexFree Sec. Litig.*, 626 F. Supp. 3d 253, 279 (D. Mass. 2022). Where, as here, Defendant's threat of enforcement "produced" Plaintiffs' injuries "by determinative or coercive effect upon the action of someone else," causation is established. *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*, 589 F.3d 458, 467 (1st Cir. 2009); *see Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 45 (1st Cir. 2005) ("[T]he fact that the deleterious effect of a statute is indirect will not by itself defeat standing.").

The Complaint meets that standard by detailing how credit card processors, direct deposit providers, and other third parties refuse to work with Plaintiffs to "avoid" the risk of prosecution "for conspiracy to violate the CSA, aiding and abetting a violation of the CSA, or laundering money from a violation of the CSA," among other potential enforcement actions. Compl. ¶¶ 12–13. For example, "[c]redit card processors refuse to work with state-regulated cannabis businesses," not because of any independent "animus against marijuana," but "out of fear that doing so would subject the card processors to federal prosecution or regulatory scrutiny." *Id.* ¶¶ 12, 93. Tellingly, credit card processors work with marijuana companies in Canada, where the CSA poses no threat. *Id.* ¶ 93. Not having access to credit cards in turn leads to Plaintiffs' economic injuries: it reduces both "the number of potential customers" willing to purchase from Plaintiffs as well as the "the amount customers are willing to spend"; Canna Provisions' revenue "dropped by around 30%" after losing access to credit card processing. *Id.* ¶¶ 36, 45, 93. Without credit cards, Plaintiffs also face "enormous public safety risks, as criminals know to target these largely cash-based businesses." *Id.* ¶ 94; *see also id.* ¶ 40. These safety risks are compounded by the CSA's interaction with 18 U.S.C. § 924, which makes it impossible for state-regulated marijuana companies to have armed security, *see* Compl. ¶ 94.

Other financial institutions also "avoid working with state-regulated marijuana companies" to avoid the risk of enforcement by the Government. *Id.* ¶ 13; *see id.* ¶ 12. Wiseacre Farm cannot obtain

direct deposit services because "those providers are unwilling to work with businesses that are illegal under federal law," forcing Wiseacre Farm to go through the laborious process of paying its employees by check, a literal pocketbook injury. *Id.* ¶ 43. The same enforcement risks also cause many banks to refuse to work with Wiseacre Farm and other Plaintiffs. *See id.* ¶¶ 4, 12–13; *see also* ¶ 43 (describing Canna Provisions officer having bank accounts shut down and employees facing difficulties obtaining mortgages). Those banks that do work with state-regulated marijuana companies charge "higher interest rates" or "additional fees" given the risks the banks face. *Id.* ¶¶ 36, 43, 91.[5]

Defendant argues that Plaintiffs have not established causation, arguing that the third-party services providers or lenders are the more direct cause of Plaintiffs' injuries. MTD at 8–9. This argument has no bearing on Plaintiffs' standing from the credible threat of enforcement Plaintiffs themselves face. *See* Part I.B.1, *supra*. Moreover, Supreme Court precedent forecloses Defendant's argument. In *Bennett v. Spear*, the plaintiffs sued one agency, the Fish and Wildlife Service, alleging that an advisory opinion the agency had issued would cause *a second agency*, the Bureau of Reclamation, to reduce the amount of reservoir water available to plaintiffs. 520 U.S. at 167–68. While the Fish and Wildlife Service claimed that causation and redressability had not been met because the harm was actually caused by the second agency, the Supreme Court disagreed. *Id.* at 168. The plaintiffs met their "relatively modest" standing burden by alleging that the Fish and Wildlife Service's opinion "has a powerful coercive effect" on the action of the second agency—failure to follow it carried the potential threat of "substantial civil and criminal penalties" for the second agency's employees. *Id*. at 169–71.

Per *Bennett*, plaintiffs can satisfy the causation element of standing if their injury was caused by "the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New*

---

[5] The fact that some banks are willing to transact with Plaintiffs in return for additional fees underscores the risk these third parties face. Compl. ¶ 43; *see generally Int'l Game Tech.*, 628 F. Supp. 3d at 401 (a party's decision to risk prosecution "does not mean that the threat of prosecution is a fiction").

*York*, 139 S. Ct. 2551, 2566 (2019); *see Parsons v. U.S. Dep't of Just*., 801 F.3d 701, 705–06 (6th Cir. 2015) (standing to sue the DOJ where plaintiffs alleged that an FBI memo caused them injury "at the hands of state and local law enforcement officers who were motivated to commit the injuries in question due to" the memo); *Wieland v. U.S. Dep't of Health & Hum. Servs*., 793 F.3d 949, 956-57 (8th Cir. 2015) (standing to sue federal agency where plaintiffs alleged that the Affordable Care Act "required" plaintiffs' health insurer "to eliminate contraceptive-free healthcare plans").

The logic from *Bennett* applies here with even greater force.  While the Fish and Wildlife Service's opinion was merely "advisory" in nature, *Bennett*, 520 U.S. at 169, here Defendant, who is responsible for enforcing the CSA, has maintained the unequivocal position that the CSA applies to intrastate marijuana and has pursued actions, including civil forfeiture, against entities that provide products or services to participants in state-regulated marijuana programs.  *See, supra* nn.1–2; *Keirton USA, Inc. v. United States*, 600 F. Supp. 3d 1270, 1271–72 (Ct. Int'l Trade 2022) (DOJ counsel arguing for bar on company from importing paraphernalia intended for use in Washington's marijuana program).

Defendant's threat of enforcement carries with it, as in *Bennett*, the risk of "substantial civil and criminal penalties."  520 U.S. at 170.  Therefore, just as it was plausible in *Bennett* that the Bureau of Reclamation "will abide by the restrictions" in the advisory opinion, rather than put its employees at risk of prosecution, *id.* at 160, it is plausible that credit card processors, banks, the Small Business Administration, and others will avoid working with Plaintiffs, rather than expose themselves or their employees to the risk of Defendant enforcing the CSA against them.  *See* Compl. ¶¶ 4, 12-13, 36, 41, 43, 89-93.  Defendant's position that the CSA outlaws state-regulated marijuana is thus having the predictable effect of dissuading third parties from working with Plaintiffs.  Having established that these third parties' decisions "were motivated by the DOJ," Plaintiffs have shown that their economic injuries are "fairly traceable" to Defendant.  *Parsons*, 801 F.3d at 714–15.

3.  *Plaintiffs Have Standing to Sue Based on the Injuries Caused Under Other Statutes When the CSA Is Applied to State-Regulated Marijuana.*

As noted above, Plaintiffs are also injured under other statutes, including 18 U.S.C. § 924, which apply to Plaintiffs solely based on Defendant's position that the CSA outlaws Plaintiffs' activities. Compl. ¶ 94; *see id.* ¶ 96 (noting Plaintiffs lack bankruptcy protections). While Defendant contends that Plaintiffs must challenge these "other federal laws and policies," not the CSA (MTD at 8–9), the case Defendant relies on, *California v. Texas*, 593 U.S. 659 (2021), provides no support for this notion. In *California v. Texas*, states and individuals sued HHS seeking a declaration that the minimum essential coverage provision contained in the Affordable Care Act ("ACA") was unconstitutional. 593 U.S. at 667. However, the only injuries the plaintiffs could point to were caused by *other* provisions of the ACA, and those provisions "*operate independently*" of the minimum essential coverage provision. *Id.* at 679 (emphasis added). Because "nothing in the text" of the ACA "suggests that" these other provisions "would not operate without" the coverage provision, the plaintiffs' alleged injuries under those other provisions were not "fairly traceable" to the challenged provision. *Id.* at 678–79.

Here Plaintiffs' injuries under Section 924 do not "operate independently" of the CSA. *Id.* at 679. Section 924's firearm prohibition is triggered by a "drug trafficking crime," which is defined as a violation of the CSA. *See* 18 U.S.C. § 924(c)(2). Thus the statute (like the bankruptcy restrictions that Defendant enforces) "would not operate" against Plaintiffs absent Defendant's position that the CSA outlaws Plaintiffs' activities. 593 U.S. at 678; *see* DOJ, *Frequently Asked Questions,* https://www.justice.gov/ust/frequently-asked-questions-faqs-consumer-information (Sept. 23, 2023) (entries on marijuana).

## C.  The Relief Sought in the Complaint Would Redress Plaintiffs' Injuries.

The third and final element of Article III standing is redressability, which requires a plaintiff to show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision." *Bennett*, 520 U.S. at 167.  A plaintiff need not show that granting the requested relief "will relieve his *every* injury"—it suffices to show that he would be given "substantial and meaningful relief." *Larson v. Valente*, 456 U.S. 228, 243–44 & n.15 (1982); *see also Parsons*, 801 F.3d at 716 ("[I]t need not be likely that the harm will be *entirely* redressed, as partial redress can also satisfy the standing requirement.").  Here, Plaintiffs allege multiple harms that would be redressed by the declaratory and injunctive relief Plaintiffs seek.

First, if the CSA were deemed unconstitutional as applied to state-regulated marijuana, the credible threat of enforcement against Plaintiffs would disappear, thereby redressing that harm.

Second, Plaintiffs have established that, but for Defendant's threat of enforcement of the CSA, Plaintiffs would be able to transact with credit card processors, the SBA, and others.  Compl. ¶¶ 5, 11–13, 36, 41, 45, 93.  Plaintiffs have therefore shown that if the relief sought in the Complaint is granted, these injuries will "likely be redressed"—*i.e.*, the third parties will abandon their restrictions on working with Plaintiffs.  For example, granting the declaratory and injunctive relief Plaintiffs seek would mean that credit card processors "would be assured [they] could safely proceed" to serve Plaintiffs without fear of prosecution, thus making it likely that they would do so.  *Wieland*, 793 F.3d at 957.

To the extent Defendant argues that Plaintiffs have not established redressability because they should be directly suing these third parties, this argument fails for the same reason as Defendant's causation arguments.  When the federal government causes third parties to take injurious actions against the plaintiff, the plaintiff has standing to sue the government directly, rather than the third parties.  *See, e.g., id.* at 955 (third party insurer that caused injury not a party); *Bennett*, 520 U.S. at 159 (Bureau of Reclamation not a party); *Parsons*, 801 F.3d at 717 (local law enforcement not a party).  Plaintiffs have therefore established all three elements of standing.

II.  **The Federal Government's Current Regulation of Intrastate Marijuana Fails Under the**
     ***Gonzales v. Raich* Test, and Thus Exceeds the Constitution's Limits on Federal Authority.**

   A.  ***Raich* Permits Congress to Regulate Intrastate Marijuana Only Where Such Regulation**
       **Is Necessary and Proper to Serve an Interstate Regulatory Goal.**

The Constitution endows Congress with general authority to regulate *interstate* but not
*intrastate* commerce; Congress may regulate the latter only where doing so is "necessary and proper
for carrying into Execution its authority to regulate Commerce." *Raich*, 545 U.S. at 5.  This limit
follows from the Constitution's division of authority between the states and the federal government:
"The States have broad authority to enact legislation for the public good—what we have often called a
'police power.'  The Federal Government, by contrast, has no such authority and 'can exercise only the
powers granted to it.'" *Bond v. United States*, 572 U.S. 844, 854 (2014) (quoting *United States v.
Lopez*, 514 U.S. 549, 567 (1995)); *see id.* at 863 ("[F]ederalism protects the liberty of the individual
from arbitrary power."); *Printz v. United States*, 521 U.S. 898, 919 (1997) (holding that Congress
possesses "not all governmental powers, but only discrete, enumerated ones").

Because "the Constitution reserves the general police power to the States," *United States v.
Morrison*, 529 U.S. 598, 618 n.8 (2000), the federal government can directly regulate intrastate
commerce only where doing so is "necessary and proper" to the exercise of the federal government's
expressly delegated power to regulate interstate commerce, *i.e.*, "Commerce … among the several
states." *Raich*, 545 U.S. at 22 (ellipsis in original) (quoting U.S. Const., Art. I, § 8).  Thus an "act
committed wholly within a State cannot be made an offence against the United States, unless it have
some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the
United States." *Bond*, 572 U.S. at 854.  The Court has accordingly warned that Congress's Commerce
Clause power "must be read carefully to avoid creating a general federal authority akin to the police
power." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012).

11

To determine whether an interstate regulation is necessary and proper to Congress's exercise of its Commerce Clause power, *Raich* directs courts to examine the relationship between the "federal interest" Congress is pursuing and the "intrastate activity" Congress seeks to regulate. 545 U.S. at 18–19. Intrastate regulation is permissible only if Congress could rationally have concluded that the intrastate activity is "an essential part of the larger regulatory scheme," such as when "failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id*. at 18–19, 26–27. In *Raich*, the Court concluded, based on the legislation and facts existing at that time, that it was necessary and proper for Congress to criminalize intrastate marijuana to effectuate its goal to "eradicate" marijuana "in the interstate market." *Id.* at 19 & n.29.

*Raich*'s holding rested on three findings, none of which holds true today. First, the Court determined that Congress's marijuana regime involved a "federal interest in eliminating commercial transactions in the interstate market in their entirety." *Id.* at 19; *see id.* n.29 (explaining that Congress "sought to eradicate" the "marijuana market"). The Court inferred this intent from Congress's decision to ban all marijuana cultivation, distribution, and possession (save for marijuana involved in government-controlled research programs). *See id.* at 12.

Second, the Court credited the congressional finding that intrastate marijuana would lead to increased interstate traffic in marijuana. *See id.* at 12 n.20; *see also id.* at 19 (citing the "concern" that "the high demand in the interstate market will draw such marijuana into that market.").

Third, the Court credited Congress's finding, and no party disputed, that marijuana was a "fungible commodity," such that there would be "enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere." *Id*. at 22; *see id.* at 21 (noting that the "submissions of the parties and the numerous amici all seem to agree" that the markets for marijuana and wheat are comparable).

After examining the legislative scheme and assessing how the "[f]indings in the introductory sections of the CSA explain why Congress deemed it appropriate to encompass local activities,"[6] *Raich* concluded that "Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." *Id.* at 20–22. Therefore, Congress "acted rationally in determining," at the time, that the "class of activities" that plaintiffs sought to exempt from the CSA "was an essential part of the larger regulatory scheme" to eliminate marijuana transactions. *Id.* at 26–27; *see id.* at 19.

In its motion to dismiss, Defendant erroneously reduces *Raich*'s multi-part analysis to a single question: whether intrastate marijuana has a substantial effect on interstate commerce, regardless of how that effect relates to Congress's interstate goals. That reading ignores that under *Raich*, a substantial effect, standing alone, is not sufficient to satisfy the Necessary and Proper Clause. *Id.* at 18. Instead, *Raich* instructs that only when the substantial effect "poses a threat to a national market" will it justify federal intervention in intrastate commerce, *id.*, or as *Lopez* put it, the intrastate activities must "in a substantial way interfere with or obstruct the exercise of the granted power." *Lopez*, 514 U.S. at 556. Thus, the substantial effect must be such that not regulating the intrastate activity "would undermine Congress's ability to implement effectively the overlying economic regulatory scheme." *United States v. Maxwell*, 446 F.3d 1210, 1215 (11th Cir.2006) (summarizing *Raich*'s holding).

The Government's reading of *Raich* is also impossible to square with *Raich*'s extensive reliance on *Wickard*. *See, e.g.*, *supra* n.6. In *Wickard,* a farmer claimed that federal wheat production quotas should not apply to him because the wheat he produced was "not intended in any part for commerce but wholly for consumption on the farm." 317 U.S. at 118. *Wickard* rejected that challenge because

---

[6] Defendant attempts to downplay *Raich*'s reliance on the CSA's findings by stating that they were quoted only in a footnote, but *Raich* repeatedly relies on those findings, stating "we have before us findings by Congress to the same effect" as the facts in another case where Congress's intrastate regulations were upheld. *Id.* at 20 (citing *Wickard v. Filburn*, 317 U.S. 111 (1942)).

"Congress may properly have considered that wheat consumed on the farm where grown if wholly outside the scheme of regulation would have a substantial effect in defeating and obstructing [Congress's] purpose to stimulate trade therein at increased prices."  *Id*. at 128–29.  *Wickard* thus confirmed that before an intrastate activity can be regulated, it must have a "substantial effect" not merely on interstate commerce, but on "defeating and obstructing" a federal interstate goal.  *Id.  Raich* adopted that reasoning and explained that both the CSA's marijuana regulations and the wheat quota regulations in *Wickard* were "comprehensive legislation to regulate the interstate market in a fungible commodity."  545 U.S. at 22.  "Here too," *Raich* continued, "Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would similarly affect price and market conditions," and thereby "frustrate the federal interest in eliminating" the "interstate market" in marijuana.  *Id.* at 19.

Other cases cited in *Raich* further confirm that the requisite substantial effect must frustrate Congress's interstate regulatory goals.  *See Lopez*, 514 U.S. at 555 (holding that Congress can regulate "activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end"); *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 283 (1981) (for Commerce Clause analysis, assessing "whether the means selected by Congress were reasonable and appropriate").

The Government's attempt to read the Necessary and Proper clause out of *Raich* is also foreclosed by the Court's explanations of *Raich* in subsequent holdings.  In 2010, *United States v. Comstock* cited *Raich* as an example of the need to assess whether a given "statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."  560 U.S. 126, 134 (2010).  Two years later, in *Sebelius*, all nine justices agreed that *Raich* turned on the Necessary and Proper Clause.  567 U.S. at 561 (Roberts, *C.J.*, concurring) ("Accordingly, we recognized [in

14

*Raich*] that 'Congress was acting well within its authority' under the Necessary and Proper Clause even though its 'regulation ensnare[d] some purely intrastate activity.'"); *id*. at 618 (Ginsburg, Sotomayor, Breyer, Kagan, *JJ.*, concurring) (quoting *Raich* and stating that "the relevant question is simply whether the means chosen [by Congress] are reasonably adapted to the attainment of a legitimate end under the commerce power"); *id*. at 654 (Scalia, Kennedy, Thomas, Alito, *JJ.*, dissenting) (explaining that the Necessary and Proper Clause "allows regulations of intrastate transactions if necessary to the regulation of an interstate market," and stating that in *Raich* the intrastate ban was "the only practicable way of enabling the prohibition of interstate traffic").

**B. The Underlying Legislative and Operative Facts Have Changed Since *Raich*.**

In the two decades since *Raich*, all the legislative and operative facts on which *Raich*'s conclusion rested have changed.  It is therefore necessary to assess Congress's regulation of intrastate marijuana based on the *new* regulatory framework and *new* factual circumstances: "the Act imposes current burdens and must be justified by current needs."  *Shelby Cty. v. Holder*, 570 U.S. 529, 536 (2013).  "A statute based upon a legislative declaration of facts is subject to constitutional attack on the ground that the facts no longer exist; in ruling upon such a challenge *a court must, of course, be free to re-examine* the factual declaration."  *Leary v. United States*, 395 U.S. 6, 38 n.68 (1969) (emphasis added); *United States v. Carolene Prod. Co.*, 304 U.S. 144, 153 (1938) ("The constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist.").  Here, all three of the factual bases for *Raich*'s conclusion no longer exist today.

*1. Congress No Longer Seeks to Ban Interstate Marijuana in Its Entirety, Nor Does Congress Believe That Banning Intrastate Marijuana Is Necessary to Achieve the CSA's Goals.*

When *Raich* was decided, the CSA's sweeping ban reflected a "federal interest in eliminating commercial [marijuana] transactions in the interstate market in their entirety," and an intrastate ban was

deemed necessary to serve that goal because not regulating intrastate marijuana would "leave a gaping hole in the CSA."  545 U.S. at 19, 22.  Starting in 2010, however, Congress itself has created "a gaping hole in the CSA," *id.* at 22, first by permitting medical marijuana in the District of Columbia, and then by enacting the Rohrabacher-Farr Amendments in 2014 (and each year thereafter) to prevent the DOJ from enforcing the CSA against participants in state medical marijuana programs.  Compl. ¶¶ 24–25.

In *Ne. Patients Grp.*, the First Circuit held that this "congressional action in the wake of the CSA reflects" a material change in the federal approach to marijuana.  45 F.4th at 549.  That case concerned a dormant Commerce Clause challenge to Maine's residency requirement for directors and officers of marijuana dispensaries.  *Id.* at 544.  Maine (and the dissent) argued that because the CSA made marijuana illegal, Maine was free to discriminate against out-of-state directors and officers in its marijuana program.  *Id.* at 548, 550; *see id.* at 558 (Gelpí, *J.*, dissenting).  The First Circuit, however, held that Congress's treatment of marijuana could not be gleaned merely by looking at the CSA as "the CSA was not Congress's last word on the market in marijuana."  *Id.* at 549.  Instead, the First Circuit relied on the Rohrabacher-Farr Amendments, explaining that contrary to the CSA's original intent of eradicating marijuana, "*Congress has taken affirmative steps to thwart efforts by law enforcement to shut down that very market*, through the annual enactment of the Rohrabacher-Farr Amendment."  *Id.* at 553 (emphasis added).  Congress thus "acknowledged, through that same measure, that this market *may continue to exist* in some circumstances *free from federal criminal enforcement and thus subject only to state regulation*."  *Id.* (emphasis added).  Because Congress was "plainly contemplating state regulation of this market," but had not otherwise "blessed Maine's protectionism," the court held that the directors and officers provision was subject to the dormant Commerce Clause.  *Id.* at 554, 556.

This decision therefore confirms that the Rohrabacher-Farr Amendments must be taken into account when assessing Congress's intent under the CSA.  Where Congress previously intended to

eradicate marijuana entirely, Congress now seeks to "limit enforcement of the national ban on participation in that market that the CSA imposes." *Id.* at 556. And whereas Congress previously left no room for state-regulated marijuana, Congress now provides for marijuana that is "subject only to state regulation," dropping its prior concerns of enforcement difficulties and swelling interstate traffic. *Id.* at 553; *see id.* at 548 (noting that "the current Rohrabacher-Farr Amendment is no anomaly, as Congress has included an identical version of it in every annual congressional appropriation to the U.S. Department of Justice" for years). In sum, Congress today is not intent on eliminating all marijuana nationwide, nor does Congress believe that banning intrastate marijuana is necessary to serve its interstate goals.

### 2. *State-Regulated Marijuana Programs Have Reduced Interstate Traffic in Marijuana.*

When *Raich* was decided, only a handful of states permitted marijuana, and without any evidence to the contrary, it was assumed that if intrastate legalization expanded, interstate commerce in marijuana would swell. Now, however, there is over a decade of data showing what happens when states regulate marijuana and the Government de-prioritizes (or in the case of the Rohrabacher-Farr Amendments, prohibits) prosecuting participants in state-regulated marijuana programs. These years have proven that state-regulated intrastate commerce in marijuana has reduced the demand for illegal interstate marijuana—the exact opposite of "undermin[ing] Congress's ability to implement" its overarching regulatory goals and scheme. *Maxwell*, 446 F.3d at 1215. For example, since 2012, there has been a 95% reduction in the amount of marijuana seized by Customs, even as seizures of other drugs have increased. Compl. ¶¶ 21, 76.[7] The reason for this reduction is that marijuana smuggled in from abroad

---

[7] Defendant cannot defeat these allegations at the pleading stage with selective quotations from Canna Provisions' website about accepting out-of-state identification from customers, *see* MTD at 3-4; moreover, Defendant omits that the *same website* warns "it is against the law to bring legal cannabis from Massachusetts across state lines." *New York Cannabis Laws*, Canna Provisions, https://cannaprovisions.com/recreational/marijuana-dispensary-near-albany-ny-12202/. Nor can Defendant object that the Complaint is "bereft" of allegations about other states' regulations, MTD at 15 n.3, when the Complaint describes those state programs, Compl. ¶¶ 58, 76, and their existence is a matter of law, *see, e.g.*, 410 Ill. Comp. Stat. Ann. 705/30-30(a)-(c) (requirements for marijuana cultivators).

(and then dispatched through interstate commerce) is not as desirable to consumers, now that they have the option of safe, regulated marijuana available from local channels. *See* Compl. ¶¶ 58, 76–77.

The reduction in interstate commerce in marijuana is also attributable to the strict controls states have implemented on their marijuana programs, *see* Compl. ¶¶ 21, 76—controls that did not exist when *Raich* was decided, *see* 545 U.S. at 32 n.41. These controls (including labelling, testing, and electronic seed-to-sale tracking) in turn address the diversion risk that motivated *Raich*. *See Commonwealth v. Richardson*, 94 N.E.3d 819, 823 (Mass. 2018) (holding that medical marijuana patient can be prosecuted for cultivating more marijuana than permitted). By reducing demand for interstate marijuana, and by imposing strict controls to prevent diversion into interstate channels, it cannot be said that state-regulated marijuana has a substantial effect that "interfere[s] with or obstruct[s]" Congress's granted power. *Lopez*, 514 U.S. at 556.

3.  *State-Regulated Marijuana Is Not Fungible with Illicit Interstate Marijuana, and Permitting the Former Does Not Prevent Regulating the Latter.*

In *Raich*, "the parties and the numerous amici all seem[ed] to agree" that that marijuana was a fungible commodity like wheat, 545 U.S. at 20–21. The Court therefore held that Congress was correct to find that a failure to ban intrastate marijuana would create "enforcement difficulties," because it is "not feasible to distinguish . . . between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate." *Id.* at 12 n.20, 22. Today, by contrast, "state-regulated marijuana products are distinguishable (from each other and from illicit interstate marijuana) based on the labelling and tracking requirements that states impose." Compl. ¶ 22. In Massachusetts, for example, the state maintains "a transparent and accountable record for tracing marijuana products through every stage of their processing"—"from seed to sapling and mature plant, from processing to wholesale distribution, from transit to stocking at the dispensary, and from inventory at dispensaries to its ultimate sale to consumers." *Id.* ¶¶ 62–68.

These controls mean that the federal government can distinguish between state-regulated marijuana and illicit interstate marijuana when enforcing the CSA.  Defendant's cited cases, which include recent criminal cases involving marijuana, show that it is enforcing the CSA against illicit interstate marijuana, even as it deprioritizes (or in some cases is barred from) prosecuting state-regulated marijuana activities.  *See* MTD at 18, 21-22 & n.6.  Indeed, the logic of the Cole Memo, and subsequent statements by Attorney General Barr and Defendant, is that the Government can distinguish between illicit interstate marijuana and state-regulated intrastate marijuana.  *See* Compl. ¶¶ 82–83.  Congress has repeatedly endorsed this notion with the Rohrabacher-Farr Amendments, which require the Government to distinguish between illicit interstate marijuana and state-regulated medical marijuana, and with the 2018 Farm Bill, which permits low-THC marijuana "with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o.  Because this low-THC marijuana is now exempt from the CSA, 21 U.S.C. § 802(16), law enforcement now must confirm THC levels before marijuana can be deemed illegal, even if it is found in interstate commerce.  Thus, whatever efforts are still required to distinguish intrastate and interstate marijuana are efforts that Congress itself has deemed acceptable.

Notwithstanding *Raich*'s heavy emphasis on the twin issues of fungibility and enforcement, the Government claims that fungibility is irrelevant to the *Raich* inquiry, citing *United States v. Nascimento*, 491 F.3d 25 (1st Cir. 2007), and *United States v. Poulin*, 631 F.3d 17 (1st Cir. 2011), where the First Circuit upheld Congressional regulation of subjects (criminal enterprises and child pornography, respectively) deemed non-fungible.  MTD at 17.  Those cases merely show that *different* legislative regimes governing *different* intrastate activities may not rely on fungibility as the basis for the Necessary and Proper analysis.  However, it is clear that, in *Raich*, the Court did rely on fungibility and the "enforcement difficulties" fungibility would create.  545 U.S. at 22.  As the First Circuit recently

confirmed (after *Nascimento* and *Poulin*), *Raich*'s conclusion depended "in part because marijuana is a 'fungible commodity.'"  *Ne. Patients Grp.*, 45 F.4th at 547 (quoting *Raich*, 545 U.S. at 18).  Under today's facts, however, the assumption that marijuana is fungible cannot be maintained: state-regulated marijuana is not "so commingled with or related to interstate commerce that all must be regulated if the interstate commerce is to be effectively controlled."  *United States v. Darby*, 312 U.S. 100, 121 (1941).

## C.  Today's New Marijuana Regime Fails Under the *Raich* Test.

Applying the current legislative regime and facts to the *Raich* test leads to only one conclusion: Congress no longer has a "rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would" undermine the CSA.  545 U.S. at 22.  Legislation cannot be upheld on a rational basis that Congress itself rejected.  When the Court assessed whether Section 4(b) of the Voting Rights Act was "irrational" in *Shelby Cty.*, the Court refused to uphold the law based on the "thousands of pages of evidence" Congress amassed "before reauthorizing the Voting Rights Act," because Congress "did not use the record it compiled to shape" the legislation.  570 U.S. at 553–54, 556. Here the Rohrabacher-Farr Amendments and the District of Columbia medical marijuana program show that Congress has abandoned any notion that intrastate marijuana is "an essential part of the larger regulatory regime," *Raich*, 545 U.S. at 26–27; *see* Part II.B.1, *supra*.  Therefore, the original reasoning that motivated the CSA in *Raich* "play[s] no role in shaping the statutory formula before us *today*" and cannot be used to justify the CSA now.  *Shelby Cty.*, 570 U.S. at 554 (emphasis added).

Because Congress is no longer interested in eradicating interstate marijuana entirely, and no longer believes that banning all intrastate marijuana is necessary to achieve the CSA's goals, what remains is a "contradictory," "half-in, half-out regime that simultaneously tolerates and forbids local use of marijuana."  *Standing Akimbo, LLC v. United States*, 141 S. Ct. 2236, 2236–37 (2021) (statement of Thomas, *J.*, respecting denial of certiorari).  Other courts have likewise recognized the irrationality of

20

the current federal approach to marijuana.  *See, e.g.*, *United States v. Guess*, 216 F. Supp. 3d 689, 695 (E.D. Va. 2016) ("[T]he current state of the law—in which state law either legalizes or criminalizes marijuana; federal law criminalizes marijuana; and federal policy does not enforce the federal criminalization of marijuana depending on a defendant's geographic location—creates an untenable grey area in which such certainty and notice have effectively, if not formally, been eradicated.").

Moreover, the facts today have eliminated the concerns about swelling interstate traffic and enforcement difficulties.  *See* Part II.B.2–3, *supra*.  Without these concerns, there is no longer a rational basis for believing that failing to prohibit state-regulated marijuana "would leave a gaping hole in the CSA."  *Raich*, 545 U.S. at 22.  Therefore, even if Congress still wished to eliminate interstate transactions in marijuana in their entirety (it does not), it has no rational basis for banning state-regulated activities *that reduce interstate traffic in marijuana*.  While Defendant urges the Court not to examine the "interaction" between the intrastate activity and Congress's goals, MTD at 16, the Constitution requires that analysis: Congress's exercise of the Necessary and Proper Clause must be "*rationally related* to the implementation of a constitutionally enumerated power."  *Comstock*, 560 U.S. at 134 (emphasis added). Because banning state-regulated marijuana can no longer reasonably be considered essential to regulating interstate marijuana, no rational basis exists for the current federal marijuana regime.

The Government erroneously insists that Plaintiffs' approach would leave Congress with only two options: completely ban intrastate marijuana or leave it unregulated.  The question is not whether Congress *could* craft a rational, comprehensive regime pursuant to which intrastate marijuana is prohibited in some circumstances and permitted in others.  The question is whether Congress has done so.  It has not.  Instead, Congress has created a "contradictory and unstable" marijuana regime that "bears little resemblance to the watertight nationwide prohibition that a closely divided Court found necessary to justify the Government's blanket prohibition in *Raich*."  *Standing Akimbo*, 141 S.Ct. at 2238

21

(statement of Thomas, *J.*, respecting denial of certiorari).  The current federal regime therefore exceeds Congress's "authority to make all Laws which shall be necessary and proper to regulate Commerce … among the several States." *Raich*, 545 U.S. at 22 (ellipses in original).

When the current federal regime is weighed, as all exercises of the Necessary and Proper Clause must be, against the "the letter and spirit of the constitution," *Sebelius*, 567 U.S. at 559, its impropriety becomes even more apparent.  "When a Law for carrying into Execution the Commerce Clause violates the principle of state sovereignty reflected in the various constitutional provisions we mentioned earlier, it is not a law *proper* for carrying into Execution the Commerce Clause," it is instead "an act of usurpation."  *Printz*, 521 U.S. at 923–24.  Here, the ban on state-regulated marijuana encroaches on health and safety, a matter that is "primarily, and historically, a matter of local concern," *Gonzales v. Oregon*, 546 U.S. 243, 271 (2006), and therefore it must be assessed "carefully to avoid creating a general federal authority akin to the police power," *Sebelius*, 567 U.S. at 536.  Thus, while the rational basis in *Raich* was sufficient to overcome these concerns, the half-in, half-out regime that exists today fails when weighed against the founding principle of state sovereignty.

Defendant argues that Congress's approach to marijuana is appropriate because it has "given space for state and local experimentation with marijuana laws," thus allowing "states to serve as laboratories of democracy."  MTD at 18–19.  This argument, however, underscores the irrationality of the current approach, for as Justice Thomas observed, "If the Government is now content to allow states to act as laboratories . . . then it might no longer have the authority to intrude on the States' core police powers to define criminal law and to protect the health, safety, and welfare of their citizens."  *Standing Akimbo*, 141 S. Ct. at 2238.  More fundamentally, "laboratories of democracy" are a facet of our Constitutional system, not an interstate regulatory goal.  Holding otherwise would mean that any time Congress *partially* (but not completely) bans an intrastate activity, the government can rely on

"laboratories of democracy" as a rational basis to justify any intrusion on state sovereignty. To the contrary, *Raich* required that the intrastate regulation be rationally calculated to achieve a specific interstate regulatory objective. No such rational basis exists here.

### D. The Court Has the Authority and Obligation to Determine How *Raich's* Holding Applies to the Current Facts of This Case.

Defendant insists that the Court should skip the above analysis and dismiss the Complaint based on *stare decisis*. But that rule applies only where a precedent "directly controls" and a decision in Plaintiffs' favor would require "overruling" that precedent, which only the Supreme Court can do. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). Here, Plaintiffs' claims do not depend on overruling *Raich*; instead they rest on the significant changes in legislative and operative facts, which together mean that *Raich* lacks "direct application" to the Complaint. *Id.* [8]

Contrary to Defendant's assertions, the Court has the obligation to consider Plaintiffs' allegations even where it is "uncertain" whether a prior Supreme Court decision squarely controls. *See, e.g., Bais Yaakov of Spring Valley v. ACT, Inc.*, 798 F.3d 46, 50 (1st Cir. 2015); *United States v. Diaz*, 519 F.3d 56, 63 & n.7 (1st Cir. 2008) (explaining that *stare decisis* did not necessarily prevent party's argument because the prior Supreme Court decision was "limited" to a specific issue, and because the prior decision did not control on the facts presented). Importantly, *Raich* concerned a specific as-applied challenge, and it "is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006). Plaintiffs are bringing a different as-applied challenge and have "alleged substantial factual changes"

---

[8] Plaintiffs reserve their right to argue that *Raich* was wrongly decided and that the Court's subsequent Commerce Clause and Necessary and Proper Clause jurisprudence has undermined both *Raich*'s holding that Congress can regulate intrastate commerce as long as it affects interstate commerce and its holding that the CSA is an economic regulation rather than a health and safety regulation. But the Court need not resolve these issues to reject Defendant's motion to dismiss.

since *Raich*.  Therefore, while *Raich* supplies the overarching legal principle to apply here, "it cannot be said that [the precedent] directly controls the question before this Court."  *Kyle-Labell v. Selective Serv. Sys.*, 364 F. Supp. 3d 394, 415–16 (D.N.J. 2019).

The Complaint is thus consistent with the longstanding practice of applying a Supreme Court precedent to new legislative or factual scenarios, even when doing so leads to a different result.  In *Roper v. Simmons*, for example, the Court affirmed the Missouri Supreme Court's holding that the death penalty for those under eighteen was unconstitutional, 543 U.S. 551, 559–60 (2005), notwithstanding a prior Court precedent, *Stanford v. Kentucky,* 492 U.S. 361 (1989), that held the opposite.  The Missouri Supreme Court had reached its decision by adhering to the "national consensus" test in *Stanford* but applying it to the current legislative facts, including that "since *Stanford* . . . 'eighteen states now bar such executions for juveniles.'"  *Roper*, 543 U.S. at 559 (quoting *State ex rel. Simmons v. Roper*, 112 S.W.3d 397, 399 (Mo. 2003)).  *Roper* confirmed that the Missouri Supreme Court was correct to apply *Stanford*'s *rule* (the "national consensus" test) to the then-current facts, rather than blithely adhering to *Stanford*'s *result*.  *Id.* at 564–67.  Per *Roper*, Plaintiffs' claims must be assessed by applying the standard announced in *Raich* to the current legislative regime and circumstances as alleged in the Complaint.  *See Milnot Co. v. Richardson*, 350 F. Supp. 221, 222–24 (N.D. Ill. 1972) (explaining that the "Supreme Court twice upheld the validity of the" Filled Milk Act in 1938 and 1944 but determining that the statute lacked a rational basis under the current facts, which included "technical advancements since 1944").

## III.    The CSA Deprives Plaintiffs of Their Fifth Amendment Due Process Rights.

The Complaint also properly states a cause of action under the Fifth Amendment's due Process Clause.  Due process protects against laws that lack rational basis and affords even greater protection when a law intrudes upon "fundamental rights and liberty interests."  *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997).  *Raich* did not address the plaintiffs' Fifth Amendment claim and instead

remanded for the Ninth Circuit to assess it.  545 U.S. at 33.  On remand, the Ninth Circuit applied the Court's "*Lawrence* framework" and held that because only "ten states other than California" permitted medical marijuana, it had "not obtained the degree of recognition" needed to consider it a fundamental right.  *Raich v. Gonzales*, 500 F.3d 850, 865 (9th Cir. 2007) (citing *Lawrence v. Texas*, 539 U.S. 558 (2003)).  The court noted, however, that the "day may be upon us sooner than expected," when "the right to use medical marijuana" is "fundamental and implicit in the concept of ordered liberty."  *Id.* at 866.

Now over three dozen states permit medical marijuana and twenty-four states (representing most of the nation's population) permit adult-use marijuana.  *See* Compl. ¶ 55.[9]  These "laws and traditions in the past half century are of most relevance here."  *Lawrence*, 539 U.S. at 571–72.  The nation's "[h]istory and tradition," *id.*, further confirm that the CSA is an aberration, not consistent with the nation's practices at the founding, nor at the passage of the Fourteenth Amendment, when marijuana was widely used for medicinal and recreational purposes.  Compl. ¶¶ 46–48.  While states may sometimes regulate those activities when appropriate for the public health, the federal ban fails under such scrutiny.

Even if marijuana cultivation and distribution is not yet considered a fundamental liberty, Congress's current approach to marijuana fails under rational basis scrutiny.  This test requires that "the means chosen by the legislature are rationally related to some legitimate government purpose."  *Wine & Spirits*, 418 F.3d at 53.  Here, for the reasons described in Part II, *supra*, the prohibition on intrastate marijuana lacks any rational relationship to Congress's current marijuana regime.  Accordingly, the current federal approach to intrastate marijuana cannot satisfy the rational basis test.

## CONCLUSION

Defendant's motion to dismiss should be denied.

---

[9] Ohio legalized adult-use marijuana after the Complaint was filed.  *See* Ohio Rev. Code § 3780.04.  Other states permit only low-THC marijuana but of a higher potency than the CSA permits.  *See* Tex. Occ. Code Ann. § 169.001 (up to 1% THC); Ga. Code Ann. § 16-12-190 (up to 5% THC); *cf.* Iowa Code Ann. § 124E.2.

Dated: March 15, 2024

Respectfully submitted,

**Boies Schiller Flexner LLP**                    **Lesser, Newman, Aleo & Nasser LLP**

 /s/ David Boies
David Boies *(admitted pro hac vice)*            Michael Aleo
333 Main Street                                   Thomas Lesser
Armonk, NY 10504                                  39 Main Street, Suite 1
(914) 749-8200                                    Northampton, MA  01060
dboies@bsfllp.com                                 Telephone:  (413) 584-7331
                                                  Facsimile:   (413) 586-7076
Jonathan D. Schiller *(admitted pro hac vice)*   aleo@LNN-law.com
Matthew L. Schwartz *(admitted pro hac vice)*    lesser@LNN-law.com
David Barillari *(admitted pro hac vice)*
55 Hudson Yards                                   *Attorneys for Plaintiffs Canna Provisions,*
New York, NY 10001                                *Inc., Gyasi Sellers, Wiseacre Farm, Inc., and*
(212) 446-2300                                    *Verano Holdings Corp.*
jschiller@bsfllp.com
mlschwartz@bsfllp.com
dbarillari@bsfllp.com

Joshua I. Schiller *(admitted pro hac vice)*
44 Montgomery Street
41st Floor
San Francisco, CA 94104
(415) 293-6899
jischiller@bsfllp.com

*Attorneys for Plaintiffs Canna Provisions,*
*Inc., Gyasi Sellers, Wiseacre Farm, Inc., and*
*Verano Holdings Corp.*

26

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2024, I caused a copy of the foregoing memorandum of law to be served, via the electronic case filing system of the Court, on all counsel of record for the parties in these proceedings.

Dated: March 15, 2024

  */s/ David Boies*
David Boies